**STATE**

v.

**Gilbert DELESTRE.**

No. 2009–175–C.A.

Supreme Court of Rhode Island.

Jan. 12, 2012.

Lauren S. Zurier, Department of Attorney General, for State.

Robert B. Mann, Esq., Providence, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, and ROBINSON, JJ.

## OPINION

Justice ROBINSON, for the Court.

On December 4, 2008, a Providence County Superior Court jury found the defendant, Gilbert Delestre, guilty of second-degree murder and of conspiracy to commit the offense of murder. He was thereafter sentenced to consecutive terms of (1) life imprisonment at the Adult Correction-

al Institutions as a result of the second-degree murder conviction and (2) ten years at the same institution as a result of the conspiracy conviction.

On appeal, defendant contends that the trial justice erred in instructing the jury concerning the concept of aiding and abetting; he argues that certain language in the jury instructions "created a presumption which violated the defendant's right to due process of the law."

The defendant also argues that the trial justice erred in declining to give a unanimity instruction to the jury with respect to the murder charge; he contends that the jury should have been told that, if it were to find defendant guilty, it must be unanimous as to the *theory* supporting such a finding of guilt—*i.e.*, whether defendant was guilty *either* as a principal, *or* as an aider and abettor, *or* as a coconspirator.

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

### Facts and Travel

### A

#### The Events of October 29 and 30, 2004 [1]

The criminal prosecution that gave rise to the instant appeal was the result of the tragic death of three-year-old Thomas J. Wright [2] on October 31, 2004.

In October of 2004, defendant and Katherine Bunnell were living in an apartment in Woonsocket with their own two children (Daziya and Destiny) [3] and with Ms. Bun-

---

1. The facts set forth in the text concerning the events that occurred on October 29 and 30, 2004 were adduced from the testimony of the several witnesses who testified at trial and from certain documents in evidence.

2. Thomas J. Wright is usually referred to in the record as "T.J." We shall do likewise.

3. We previously summarized many of the facts that are relevant to the instant case when we upheld the termination of the parental rights of defendant and Ms. Bunnell with respect to Daziya and Destiny. *See In re Destiny D.*, 922 A.2d 168 (R.I.2007).

nell's three nephews (David, Mickey, and T.J. Wright).

On the evening of October 29, 2004, defendant and Ms. Bunnell hired a fifteen-year-old high school student, Kayla, to babysit for the five children so that the couple (accompanied by defendant's cousin) could go to a nightclub in nearby Milford, Massachusetts.

When defendant and Ms. Bunnell returned to their Woonsocket home in the early morning hours of October 30 after their night out, Ms. Bunnell exited the car in which they had traveled to and from the nightclub and went into the apartment, while defendant and his cousin remained in the car and continued the conversation in which they had been engaged. Shortly thereafter, Ms. Bunnell appeared at the doorway of the apartment and yelled to defendant to "get the f* * * back in here and clean the mess that the baby made." The defendant then entered the apartment.

According to the trial testimony of Kayla (the babysitter), she was asleep when defendant and Ms. Bunnell returned from their night out and was awakened by the shouts of Ms. Bunnell and defendant in the apartment. The babysitter testified that Ms. Bunnell was yelling: "What happened to my f* * * house?" She added that defendant was repeating: "Look, the house is a mess again. Look at the f* * * floor, [it] is a mess again." Kayla testified that she then noticed that T.J. was no longer on the couch where he had been sleeping; she also observed that some "milk and yogurt in a bowl" were on the floor and that "the bowl was tipped over a little bit." Kayla advised Ms. Bunnell that T.J. may have been responsible for the "mess."

Kayla testified that, after yelling about the mess, defendant went upstairs; the babysitter added that, from her position on the first floor, she heard the sound of "loud slaps" coming from upstairs. Kayla testified that, after hearing the slaps, she heard T.J. crying; she said that she then observed Ms. Bunnell going upstairs. The babysitter stated that she did not follow Ms. Bunnell upstairs; it was her testimony, however, that she could hear Ms. Bunnell asking: "What did you do to my house?"

Kayla testified that Ms. Bunnell then carried T.J. by his upper arms down the stairs. Kayla stated that, when Ms. Bunnell reached the bottom of the stairs, she let go of T.J., causing him to fall to the floor. It was the babysitter's further testimony that, at that point in time, as Ms. Bunnell "grabbed [T.J.] by his wrist and yanked him up off the floor," defendant came downstairs. Kayla stated that Ms. Bunnell began yelling while asking T.J. "why he [had] made a mess on [the] f* * * floor." According to Kayla, Ms. Bunnell repeatedly hit T.J. on his face, back, and chest. Kayla stated that, each time that T.J. was hit, he would fall to the ground—and that Ms. Bunnell would then pick him back up by his wrist.

Kayla further testified that Ms. Bunnell then "pulled [T.J.] over" to the closet by his wrist and poured milk on his head while defendant watched from three to four feet away. The babysitter testified that Ms. Bunnell was also yelling: "You want to waste my milk? This is what happens when you waste my f* * * milk." The defendant did not do or say anything at that time.

Kayla testified that Ms. Bunnell then began to look for her car keys so that she could drive the babysitter home. The babysitter testified that at that moment she turned around and observed "T.J. * * * coming towards [Ms. Bunnell] like he was in the air and falling towards the floor

* * *." She added that the child ultimately fell in front of Ms. Bunnell. Kayla testified that, during the just-described incident, T.J. was at least three feet off the ground; she added that, as T.J. was "flying through the air," defendant was near the closet door and his "arms were falling back down to his side"[4] Kayla stated that, when T.J. landed, his face hit the ground and he landed on his stomach with his leg twisted underneath him. Kayla further testified that Ms. Bunnell then picked the child up by his wrists and that defendant stated: "You better get him out of here before I f* * * drop **him.**"[5] (Emphasis added.)

Ms. Bunnell then left the apartment in order to drive Kayla home. The defendant testified that, after the departure of Kayla and Ms. Bunnell, he "back-handed" T.J., which resulted in the boy falling down eight to ten stairs.

Subsequently, defendant's cousin, who had spent the evening with defendant and Ms. Bunnell, came into the apartment. When the cousin observed T.J.'s condition, he called for an ambulance.

Thereafter, emergency responders arrived at the apartment. T.J., who was unconscious and who, in the words of a fire department rescue responder, looked like "someone who had been in a boxing match," was transported to the nearby Landmark Medical Center.

## B

### The Subsequent Events

T.J. was subsequently transferred from Landmark Medical Center to Hasbro Children's Hospital in Providence, where he died on October 31, 2004 "as a result of brain injuries and displaced fracture of the left femur due to blunt force trauma." After conducting an autopsy, an assistant medical examiner in the Rhode Island Department of Health categorized T.J.'s manner of death as a homicide.

## C

### The Indictment, the Trial, and the Verdict

On January 21, 2005, a Providence County grand jury indicted defendant for the murder of T.J., in violation of G.L.1956 §§ 11–23–1 and 11–23–2; he was also indicted for conspiracy to commit murder, in violation of G.L.1956 §§ 11–1–6 and 11–23–1. On November 19, 2008, defendant's trial began in the Superior Court for Providence County; the trial lasted for approximately three weeks.

On December 4, 2008, the jury found defendant not guilty of the first-degree murder of T.J., but it found him guilty of the second-degree murder of the young boy and of conspiracy to commit the murder.

## D

### The Jury Instructions Challenged on Appeal

After the trial justice instructed the jury, defendant objected to several aspects of the instructions; on appeal, defendant focuses on two of the objections that he articulated at trial—*viz.*, (1) his objection concerning the trial justice's aiding-and-abetting instruction and (2) his objection

---

**4.** When he testified, defendant acknowledged that his hands had been outstretched, as described by Kayla; however, it was his testimony that his hands were in that position because he was pointing to Ms. Bunnell's keys—and not because he had been in the process of throwing T.J.

**5.** At trial, defendant testified that what he said to Ms. Bunnell was: "Get him out of here before I drop **you.**" (Emphasis added.)

concerning the trial justice's declining to instruct the jury that, if it were to find defendant guilty, there needed to be unanimity as to the *theory* supporting that finding.

The defendant's first appellate issue concerns the last sentence of the trial justice's instruction on aiding and abetting. That sentence reads as follows:

"A person who aids or abets is held responsible for the natural or reasonable, or probably [*sic*] consequences of any act if he knowingly and intentionally aided or which he assisted or participated."

The defendant's second appellate contention is that the trial justice erred in declining to give the following instruction that defense counsel had proposed:

"In order for you to convict the defendant of murder, *you must unanimously agree on the theory* upon which you base your decision. In other words, all twelve of you must agree that the defendant was guilty as a principal, or all twelve of you must agree that the defendant was guilty as an aider and abettor, or all twelve of you must agree that the defendant was guilty as a coconspirator." (Emphasis added.)

## II

### Standard of Review

■ It is well established that we review challenged jury instructions in a *de novo* manner. *State v. Adefusika,* 989 A.2d 467, 475 (R.I.2010); *see also State v. Cipriano,* 21 A.3d 408, 423 (R.I.2011); *State v. Palmer,* 962 A.2d 758, 764 (R.I. 2009); *State v. Graham,* 941 A.2d 848, 855 (R.I.2008). In conducting that review, "it is our role to *examine the instructions in their entirety* to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them * * *." *State v. John,* 881 A.2d 920, 929 (R.I. 2005) (emphasis added) (internal quotation

marks omitted); *see also Adefusika,* 989 A.2d at 475; *State v. Cardin,* 987 A.2d 248, 250 (R.I.2010); *State v. Ventre,* 910 A.2d 190, 197 (R.I.2006). It is a corollary principle that, "this Court will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *State v. Kittell,* 847 A.2d 845, 849 (R.I.2004) (internal quotation marks omitted); *see also State v. Ros,* 973 A.2d 1148, 1166 (R.I.2009); *Palmer,* 962 A.2d at 764; *John,* 881 A.2d at 929; *State v. Ibrahim,* 862 A.2d 787, 796 (R.I. 2004).

■ In a case such as this, when we review a trial justice's challenged jury instructions, we will uphold them when they "adequately cover the law." *State v. Ensey,* 881 A.2d 81, 95 (R.I.2005); *see also State v. Brown,* 898 A.2d 69, 82 (R.I.2006); *State v. Grayhurst,* 852 A.2d 491, 517 (R.I. 2004); *State v. Grundy,* 582 A.2d 1166, 1170 (R.I.1990). However, "even if we conclude that a jury instruction was erroneous, reversal is warranted only if a jury could have been misled to the prejudice of the complaining party." *Adefusika,* 989 A.2d at 475 (internal quotation marks omitted); *see also Ventre,* 910 A.2d at 197 ("If we are persuaded that the jury could have been misled by an erroneous charge to the resultant prejudice of the complaining party, reversal is warranted."). *See generally State v. Lynch,* 19 A.3d 51, 60 (R.I.2011); *Palmer,* 962 A.2d at 764–65; *Graham,* 941 A.2d at 855; *State v. Sivo,* 925 A.2d 901, 913 (R.I.2007).

## III

### Analysis

#### A

#### The Aiding–and–Abetting Instruction

##### 1. The Defendant's Contention

■ On appeal, defendant contends that he was denied his right to due process that

is guaranteed by the Fourteenth Amendment to the United States Constitution[6] as a result of the trial justice's instruction to the jury that "[a] person who aids or abets is held responsible for the natural, or reasonable, or probably [*sic*] consequences of any act if he knowingly and intentionally aided or which he assisted or participated."[7] The defendant specifically argues that this instructional language is improperly conclusive and improperly shifts the burden of proof from the state to the defendant; he contends that said language is inconsistent with the holdings of the United States Supreme Court in *Sandstrom v. Montana*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979) and this Court in *State v. Amado*, 433 A.2d 233 (R.I.1981).

The defendant relies on *Amado*, 433 A.2d at 235, a case in which the defendant was charged with second-degree murder. The trial justice in that case had instructed the jury that *"[t]here is * * * a presumption that a person intends all of the natural and probable consequences of his voluntary acts."* *Id.* at 236–37 (emphasis in original). That instruction was deemed to be constitutionally defective because, despite some general language, the trial justice never informed the jurors that they "had a choice concerning the presumption of intent." *Id.* at 240, 241. Indeed, it was apparent "that the trial justice gave a

binding and unqualified instruction on the question of intent which could not be ignored by the jurors." *Id.* at 240. Accordingly, this Court reversed defendant's conviction. *Id.* at 241.

The defendant additionally relies on the United States Supreme Court's opinion in the case of *Sandstrom*, 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), a case that essentially involves the same issues as were before this Court in *Amado*. The Court in *Sandstrom*, 442 U.S. at 512, 99 S.Ct. 2450, was confronted with a jury instruction to the effect that "the law presumes that a person intends the ordinary consequences of his voluntary acts." It was the Supreme Court's holding in *Sandstrom* that the trial justice's instruction constituted "constitutional error" for two reasons—*viz.*, (1) because the jurors may have interpreted the instruction as being "an irrebuttable direction by the court to find intent once convinced of the facts triggering the presumption;" and (2) because the jurors may have interpreted the instruction as shifting the burden of proof from the prosecution to the defendant. *Id.* at 517, 521, 99 S.Ct. 2450.

## 2. The Pertinent Principles of Law

■ Pursuant to the United States Constitution, the state in a criminal trial has the burden of proving beyond a reasonable

---

**6.** In addition to his argument based on the United States Constitution, defendant also contends on appeal that the aiding-and-abetting instruction quoted in the text violated article 1, sections 2 and 10 of the Rhode Island Constitution. However, defendant did not bring to the attention of the trial justice his contention that the instruction at issue was violative of the Rhode Island Constitution. Accordingly, in view of this Court's well-established raise or waive rule, we shall not address defendant's state constitutional contention. *See State v. Bettencourt*, 723 A.2d 1101, 1107 (R.I.1999) (stating that "[a]ccording to our well-settled 'raise or waive' rule, issues that were not preserved by a specific

objection at trial, sufficiently focused so as to call the trial justice's attention to the basis for said objection, may not be considered on appeal" (some internal quotation marks omitted)); *see also State v. DeOliveira*, 972 A.2d 653, 659 (R.I.2009); *State v. Anderson*, 752 A.2d 946, 948 (R.I.2000).

**7.** We consider the adverb "probably" which occurs in the transcript of the jury instruction that is quoted in the text to be a typographical error or perhaps a *lapsus linguae*. In our judgment, the adjective "probable" is what was intended.

doubt *every element necessary* to constitute the commission of a crime with which a defendant is charged. *State v. Hazard*, 745 A.2d 748, 751 (R.I.2000) (stating that "[t]he Due Process Clause of the Fourteenth Amendment to the United States Constitution * * * den[ies] the state the power to deprive the accused of liberty unless the state proves every element necessary to constitute the crime charged beyond a reasonable doubt"); *see also Sullivan v. Louisiana*, 508 U.S. 275, 277–78, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993) (stating that "[t]he prosecution bears the burden of proving all elements of the offense charged * * * and must persuade the factfinder beyond a reasonable doubt of the facts necessary to establish each of those elements" (internal quotation marks omitted)); *Leland v. Oregon*, 343 U.S. 790, 794, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952) (stating that the prosecution is required "to prove beyond a reasonable doubt every element of the crime charged"); *Sivo*, 925 A.2d at 915 (explaining that the United States Constitution requires the state to prove each element of the charged crime beyond a reasonable doubt); *State v. DelBonis*, 862 A.2d 760, 765 (R.I.2004).

■ It follows that a jury instruction violates a person's due process rights if it relieves the prosecution of the weighty burden of proving beyond a reasonable doubt each element of the crime of which a defendant stands accused. *Hazard*, 745 A.2d at 751; *see also Sivo*, 925 A.2d at 915.

■ And, of particular pertinence to the instant case, it should be borne in mind that, when the intent of the defendant is "an ingredient of the crime charged, its existence is a question of fact which must be submitted to the jury." *Morissette v. United States*, 342 U.S. 246, 274, 72 S.Ct. 240, 96 L.Ed. 288 (1952);[8] *see also Sandstrom*, 442 U.S. at 521–22, 99 S.Ct. 2450; *United States v. Sturm*, 870 F.2d 769, 777 (1st Cir.1989).

■ A trial justice presiding over a criminal trial may instruct the jurors on drawing inferences, particularly as to intent; the inferences that they may draw, however, must be *permissive* inferences. *Amado*, 433 A.2d at 241; *see also Sandstrom*, 442 U.S. at 514–15, 99 S.Ct. 2450 (stating that the jurors were not instructed that "they had a choice," pursuant to which the jurors could draw a permissive inference); *United States v. United States Gypsum Co.*, 438 U.S. 422, 446, 98 S.Ct. 2864, 57 L.Ed.2d 854 (1978) ("[T]he jury must remain free to consider additional evidence before accepting or rejecting [an] inference. * * * [U]ltimately the decision on the issue of intent must be left to the trier of fact alone"); *Ventre*, 910 A.2d at 198 n. 5 (stating that "*permissive inferences* are acceptable in criminal trials in appropriate circumstances provided that

---

8. Justice Jackson's opinion for the Court in *Morissette v. United States*, 342 U.S. 246, 72 S.Ct. 240, 96 L.Ed. 288 (1952), explicitly noted that the law recognizes a few exceptions to "the ancient requirement of a culpable state of mind" as an element of a crime. *Id.* at 250, 251 n. 8, 72 S.Ct. 240; *see also* 1 Wayne R. LaFave, *Substantive Criminal Law* § 5.2(f) at 357 (2d ed. 2003) (stating that "[t]he legislature sometimes creates statutory presumptions to aid the prosecution in proving the mental side of the crime, including a required intention"). *See generally* Gary Fields & John

R. Emshwiller, *As Federal Crime List Grows, Threshold of Guilt Declines*, Wall Street Journal, Sept. 27, 2011, at A1 (indicating that the exceptions to the *mens rea* requirement have significantly increased in number in recent decades).

However, just as was true in the *Morissette* case itself, none of the exceptions to the "culpable state of mind" requirement would apply to the intent issue that the instant case involves. *See Morissette*, 342 U.S. at 250, 72 S.Ct. 240.

there is a rational connection between the fact proven and the inference to be drawn" (emphasis in original) (internal quotation marks omitted)). By contrast to a permissive inference, a conclusive presumption "effectively eliminate[s] intent as an ingredient of the offense." *Morissette*, 342 U.S. at 275, 72 S.Ct. 240; *see also United States Gypsum Co.*, 438 U.S. at 446, 98 S.Ct. 2864; *Ventre*, 910 A.2d at 198 n. 5; Laurie A. Briggs, Note, *Presumptive Mens Rea: An Analysis of the Federal Judiciary's Retreat from Sandstrom v. Montana*, 64 Notre Dame L.Rev. 367, 367 n.3 (1989) ("A *conclusive* presumption requires the factfinder to find the presumed fact upon proof of the basic fact, even in the face of [rebutting] evidence." (Emphasis in original)).

In *Amado*, this Court held that the instruction given by the trial justice in that case (like the instruction at issue in *Sandstrom*) involved a *conclusive* presumption due to the fact that the instruction concerning the presumption was not accompanied by "any indication that the presumption could be rebutted * * * or that certain circumstances would allow the jurors to ignore this presumption." *Amado*, 433 A.2d at 240; *see Sandstrom*, 442 U.S. at 523, 99 S.Ct. 2450. Such a conclusive presumption "conflict[s] with the overriding presumption of innocence with which the law endows the accused and which extends to every element of the crime." *Sandstrom*, 442 U.S. at 523, 99 S.Ct. 2450 (internal quotation marks omitted); *see also Amado*, 433 A.2d at 241.

■ It should also be borne in mind that an instruction creating a presumption, even if it is not a conclusive presumption, may nevertheless improperly shift the burden of persuasion to the defendant. *See Sandstrom*, 442 U.S. at 524, 99 S.Ct. 2450 ("A presumption which, although not conclusive, had the effect of shifting the bur-

den of persuasion to the defendant, would have suffered from similar infirmities."). A jury may interpret a presumptive instruction to mean that "upon proof by the State of the [crime], and of additional facts not themselves establishing the element of intent, the burden was shifted to the defendant to prove that he lacked the requisite mental state." *Id.*

### 3. The Instructional Language at Issue

■ Focusing now on the case before us, it is crucially important to bear in mind that the challenged jury instruction concerned the concept of aiding and abetting—in contrast to the instructions at issue in *Amado* and *Sandstrom* (in which the defendants were charged with second-degree murder and "deliberate homicide," respectively). *Compare State v. Diaz*, 654 A.2d 1195, 1202 (R.I.1995) (stating that the aiding and abetting "standards do not require * * * that the accused must foresee the consequences of such unlawful acts"), *with Amado*, 433 A.2d at 238 (stating that "[t]he challenged instruction bears directly on * * * whether defendant possessed the *intent to kill* and, for second-degree murder, the added elements of *malice aforethought or premeditation* " (emphases added)), *and Sandstrom*, 442 U.S. at 520–21 n. 10, 99 S.Ct. 2450 (describing as follows the pertinent murder statute: "In Montana, a person commits the offense of deliberate homicide if he purposely or knowingly causes the death of another human being. * * * *The statutorily defined elements of the offense*, each of which the State must prove beyond a reasonable doubt, *are therefore causing the death of another human being with the knowledge* that you are causing *or with the purpose* to cause the death of that human being" (emphasis in original) (internal quotation marks omitted)).

In view of the lack of a requirement in the aiding-and-abetting context that the accused "must foresee the consequences" of the unlawful act(s) at issue, it follows that our analytical approach to the instant case will differ significantly from our analysis in *Amado* and from that of the Supreme Court in *Sandstrom*.

■ Rhode Island's aiding-and-abetting statute provides in pertinent part as follows:

> "Every person who shall aid, assist, abet, [or] counsel * * * another to commit any crime or offense, shall be proceeded against as principal or as an accessory before the fact, according to the nature of the offense committed * * *." Section 11–1–3.

In order to convict a defendant of a crime as an aider and abettor, "the circumstances must establish that a defendant shared in the criminal intent of the principal [and that there was] a community of unlawful purpose at the time the act [was] committed." *State v. Gazerro*, 420 A.2d 816, 828 (R.I.1980) (internal quotations marks omitted); *see also Diaz*, 654 A.2d at 1202; *Curtin v. Lataille*, 527 A.2d 1130, 1132 (R.I.1987). In addition, the prosecution must present some evidence that a defendant "participat[ed] in the criminal act in furtherance of the common design, either before or at the time the criminal act is committed." *Gazerro*, 420 A.2d at

828 (internal quotation marks omitted); *see also State v. Evans*, 742 A.2d 715, 721 (R.I.1999); *State v. Brezinski*, 731 A.2d 711, 715 (R.I.1999). Significantly, however, as previously indicated, this Court has expressly held that the just-referenced "standards do not require * * * that the accused must foresee the consequences of such unlawful acts." *Diaz*, 654 A.2d at 1202; *see also Brezinski*, 731 A.2d at 715.

Upon reviewing the trial justice's instruction to the jury in light of Rhode Island's statutory language concerning aiding and abetting, it is clear to us that the instruction accurately reflected this jurisdiction's law with respect to the intent required by the aiding-and-abetting concept—because it explained that (only) if defendant knowingly and intentionally aided and abetted could he be held responsible for the natural, or reasonable, or probable consequences of that act.[9] *See* Section I.D, *supra*. Moreover, the instruction not only adequately describes Rhode Island's law concerning aiding and abetting, but it is also consistent with the law in a majority of states in this country. *See Gonzales v. Duenas–Alvarez*, 549 U.S. 183, 191, 196, 127 S.Ct. 815, 166 L.Ed.2d 683 (2007) (stating that "many States and the Federal Government apply some form or variation of [the natural and probable consequences doctrine],[10] or permit jury

---

**9.** As the state has pointed out in its brief and at oral argument, this Court has affirmed, albeit without any analysis or specific comment, instructions with respect to aiding and abetting that are nearly identical to those challenged by defendant in the instant case. *See, e.g., State v. Lambert*, 705 A.2d 957, 963 (R.I.1997) (affirming a jury instruction that stated that "[a] person who aids or abets is held responsible for the natural, or reasonable, or probable consequences of any act that he knowingly and intentionally aided or in which he assisted or participated" (internal quotation marks omitted)); *State v. Medeiros*, 599 A.2d 723, 726 (R.I.1991) (affirming a jury

instruction which stated that "[a] person who aids and abets is * * * liable for the natural and reasonable or probable consequences of any act that he knowingly and intentionally aided or encouraged").

**10.** The natural and probable consequences doctrine provides that an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets." Joshua Dressier, *Understanding Criminal Law* § 30.05[B][5] at 443 (2d ed. 1997) (internal quotation marks omitted); *see, e.g., People v.*

inferences of intent [in certain aiding and abetting] circumstances" and listing Rhode Island as one of the "many States").[11] For these reasons, it is our opinion that the trial justice's instruction correctly hewed to our settled law concerning the intent necessary to prove aiding and abetting; as a result, defendant's due process rights were not violated by a conclusive or burden-shifting presumption.

■ We would further note that we are mindful that it is our role to review "challenged * * * jury instructions *in the context* in which they were rendered." *Adefusika,* 989 A.2d at 475 (emphasis added) (internal quotation marks omitted); *see also Lynch,* 19 A.3d at 58; *John,* 881 A.2d at 929; *State v. Hurteau,* 810 A.2d 222, 225 (R.I.2002). It should also be borne in mind that this Court, in its consideration of challenged instructions, views "the instructions as a whole." *Ventre,* 910 A.2d at 197; *see also Adefusika,* 989 A.2d at 475. The trial justice in the case at bar instructed the jury on aiding and abetting in pertinent part as follows:

"Now I'll talk to you about aiding and abetting. * * * It's not a separate offense. * * * The guilt of the Defendant under any of the offenses you are considering, whether it's first degree murder, second degree murder or manslaughter, may be established without proof that the Defendant personally did every act constituting the offense charged. The law provides that whoever aids, abets, assists, counsels, commands or procures another to commit a crime is nonetheless criminally liable as if he or she had personally committed the crime.

" * * * The law holds that everyone who knowingly and willfully participates in the commission of a crime is responsible for that crime just as if he had committed the crime alone.

" * * * *

"The State is required to show that the Defendant shared in the criminal intent of the principal person who committed the offense or offenses. In other words, the evidence must show that there was a community of unlawful pur-

Prettyman, 14 Cal.4th 248, 58 Cal.Rptr.2d 827, 926 P.2d 1013, 1020 (1996) (setting forth the principles of the natural and probable consequences doctrine and stating that an aider and abettor "is guilty not only of the offense he intended to facilitate or encourage, but also of any reasonably foreseeable offense committed by the person he aids and abets" (internal quotation marks omitted)).

11. A majority of jurisdictions accept the theory of aiding and abetting that is referenced in the text. See, e.g., United States v. Walker, 99 F.3d 439, 443 (D.C.Cir.1996) (stating that the District of Columbia Circuit has "explicitly recognized that once a common design is established, the aider and abettor is responsible not only for the success of the common design, but also for the probable and natural consequences that flow from its execution"); United States v. Miller, 22 F.3d 1075, 1078–79 (11th Cir.1994) (stating that an accessory can be held "liable for any criminal act which in

the ordinary course of things was the natural or probable consequence of that criminal activity" (internal quotation marks omitted)); United States v. Barnett, 667 F.2d 835, 841 (9th Cir.1982) (stating that "[a]n aider and abettor is liable for any criminal act which in the ordinary course of things was the natural or probable consequence of the crime that he advised or commanded, although such consequence may not have been intended by him" (internal quotation marks omitted)); United States v. DeLaMotte, 434 F.2d 289, 293 (2d Cir.1970) (stating that an accessory "is liable for any criminal act which, in the ordinary course of events, was the natural or foreseeable consequence of the crime that he advised or commanded"); Hudgins v. Moore, 337 S.C. 333, 524 S.E.2d 105, 108 n. 5 (1999) (stating that "[a]ccomplice liability applies to murder that is the natural and probable consequence of the crime to which the defendant was an accomplice").

pose at the time the criminal act was committed, and that the Defendant was in some fashion a knowing, willing, and active participant in it.

"Thus, in order to aid and abet another to commit a crime, it is necessary that a [d]efendant willfully associate herself or himself in some way with the criminal venture, and willfully participate in it as he would in something he himself wishes to bring about. Of course, you cannot find the Defendant guilty under the aiding and abetting theory unless you find that the Defendant in some way participated in or assists in its commission.

" * * * Some affirmative conduct by the Defendant to help in planning or carrying out the crime is necessary to find him guilty on an aiding and abetting theory.

"To find the Defendant is guilty because he aided and abetted Katherine Bunnell to commit the crime against Thomas Wright, you must find beyond a reasonable doubt that there was a community of unlawful purpose at the time of the criminal act at the time the act was committed, and that the Defendant was a knowing, willing and active participant in that community in some way. In order to aid and abet another to commit a crime, it is necessary that a defendant willfully associate himself in some way with the criminal venture and willfully participate in it as he would in something he himself wishes to bring about.

"Of course, you may not find a defendant guilty under the aiding and abetting theory unless you find beyond a reasonable doubt that every element of the offense which you are considering was committed by some person and that this Defendant participated in its commission. Bear in mind that the law of

aiding and abetting does not require that the Defendant must foresee all of the consequences of the unlawful action in which he assists or participates, nor must every act of this Defendant coincide with the action of the principal. A person who aids or abets is held responsible for the natural, or reasonable, or probably consequences of any act if he knowingly and intentionally aided or which he assisted or participated."

Reviewing the challenged instruction in its entirety, it is our opinion that an ordinary, intelligent lay juror would not have interpreted it as being either conclusive or burden-shifting. Indeed, the trial justice expressly instructed the jury that it "may not find [the] defendant guilty under the aiding and abetting theory unless you find beyond a reasonable doubt that every element of the offense which you are considering was committed by some person and that this Defendant participated in its commission." (*See* the last paragraph of the above-quoted extract from the jury instruction.) The trial justice additionally stated the following in her instruction concerning the necessary intent to kill to convict a defendant of murder:

"You *may infer*, although you're not required to, that a person intends the natural and probable consequences of acts knowingly done or knowingly omitted. It is *entirely up to you*, however, to decide what facts to find from the evidence received at trial." (Emphasis added.)

Accordingly, it is our opinion that the instruction considered in its entirety did not relieve the state of its burden and did not violate defendant's due process rights. *See generally State v. Cipriano,* 430 A.2d 1258, 1262 (R.I.1981) (considering the instruction as a whole and concluding that the trial justice's language requiring the state to prove all elements of the crime

beyond a reasonable doubt "effectively neutralized any potential burden-shifting effect that [the] charges, standing alone, might have had on the jury").

## B

### The Unanimity Instruction

■ As a separate appellate contention, defendant argues that the trial justice committed reversible error by declining to instruct the jurors that, in order to convict him of murder, it was necessary that they be unanimous as to the *theory* supporting such a conviction.[12]

As we noted in our discussion of the instruction relative to aiding and abetting, it is a fundamental principle that the prosecution bears the burden of proving beyond a reasonable doubt every *element* necessary to constitute the crime with which a defendant is charged. *Hazard*, 745 A.2d at 751; *see also Sullivan*, 508 U.S. at 277–78, 113 S.Ct. 2078; *Leland*, 343 U.S. at 794, 72 S.Ct. 1002; *Sivo*, 925 A.2d at 915; *DelBonis*, 862 A.2d at 765. Accordingly, in the instant case the state unquestionably was required to prove each *element* of second-degree murder as set forth in § 11–23–1. At trial, the state relied upon three *theories* as being proba-

tive of second-degree murder beyond a reasonable doubt: *viz.*, (1) that defendant was guilty as a principal; or (2) that he was guilty as an aider or abettor; or (3) that he was guilty as a coconspirator. The defendant urges this Court to hold that there should have been a unanimous conclusion by the jury as to one of the just-mentioned *theories* based upon which defendant was found guilty of second-degree murder.

■ No general requirement exists pursuant to which a "jury [must] reach agreement on the preliminary factual issues which underlie the verdict." *Schad v. Arizona*, 501 U.S. 624, 632, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991) (plurality opinion) (internal quotation marks omitted); *see also* 23A C.J.S. *Criminal Law* § 1883 at 508 (2006) (stating that "[i]f a crime may be committed under alternative theories, a jury is not required to be unanimous as to each theory"); 3 David S. Rudstein et al., *Criminal Constitutional Law* § 14.03[3] at 14–36 (2011) (stating that jurors need not unanimously make a decision as to the precise means by which a crime was committed and further stating that the jurors must unanimously agree only upon defendant's guilt of the crime that was charged).[13]

12. The actual instruction requested by defendant would have required that, in order to convict defendant of murder, "all twelve [jurors] must agree that the defendant was guilty as a principal, *or* all twelve [jurors] must agree that the defendant was guilty as an aider and abettor, *or* all twelve [jurors] must agree that the defendant was guilty as a coconspirator." (Emphasis added.)

13. In 1903, the New York Court of Appeals issued an opinion in the case of *People v. Sullivan*, 173 N.Y. 122, 65 N.E. 989 (1903), which articulated the following carefully phrased rule of law:

"[I]t was not necessary that all the jurors should agree in the determination that there was a deliberate and premeditated

design to take the life of the deceased, or in the conclusion that the defendant was at the time engaged in the commission of a felony, or an attempt to commit one. It was sufficient that each juror was convinced beyond a reasonable doubt that the defendant had committed the crime of murder in the first degree as that offense is defined by the statute." *Id.* at 989–90.

The just-mentioned holding, which has come to be known as "the *Sullivan* rule," has been widely adopted by many of our sister states. *See, e.g., State v. James*, 698 P.2d 1161, 1165 (Alaska 1985) (adopting "the *Sullivan* rule for cases in which a jury is instructed disjunctively on alternative methods by which a defendant may commit a single of-

We have previously addressed the issue of jury unanimity in the context of whether, pursuant to the pertinent statute, a jury must agree unanimously as to whether a defendant acted as a principal or as an aider and abettor in *State v. Davis. See* 877 A.2d 642 (R.I.2005). On appeal, defendant relies on some language in our opinion in *Davis* as the basis for his contention that, for a conviction to be sustainable, the jurors must unanimously agree beyond a reasonable doubt as to each theory, as well as to each element. In addition, defendant asks this Court to reconsider *Davis* in light of the United States Supreme Court's holdings in *Richardson v. United States*,[14] 526 U.S. 813, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), and *Schad v. Arizona*, 501 U.S. 624, 111 S.Ct. 2491, 115 L.Ed.2d 555 (1991).

In *Davis*, 877 A.2d at 648, we recognized that a "defendant's manner of participation, whether as a principal or [as] an

aider or abettor, *is not an element* of the crime." (Emphasis added.) Accordingly, pursuant to the holding in *Davis*, the prosecution is not required to persuade a unanimous jury beyond a reasonable doubt with respect to *the manner* in which a defendant participated in a crime. *Id.* Our holding in that case was based on the pertinent statutory language (§ 11–1–3), which "eliminates the legal distinction between [1] the commission of a crime as a principal and [2] aiding and abetting another in the commission of a crime." *Davis*, 877 A.2d at 648; *see also* 23A C.J.S. *Criminal Law* § 1883 at 508 (noting that "a jury need not unanimously find that a defendant acted either as a * * * perpetrator or an aider and abettor [because the] * * * statute governing * * * aider and abettor liability merely establishes a separate basis of liability, but not a separate crime or element of the underlying crime").

fense"); *Taylor v. State*, 840 N.E.2d 324, 333 (Ind.2006) (stating that, "while jury unanimity is required as to the defendant's guilt, it is not required as to the theory of the defendant's culpability"); *Wells v. Commonwealth*, 561 S.W.2d 85, 88 (Ky.1978) (acknowledging "numerous other jurisdictions" which have followed the rationale of *Sullivan* ); *Holland v. State*, 91 Wis.2d 134, 280 N.W.2d 288, 292–93 (1979) (quoting *Sullivan* and explaining that "[u]nanimity is required only with respect to the ultimate issue of the defendant's guilt or innocence of the crime charged, and unanimity is not required with respect to the alternative means or ways in which the crime can be committed"). *But see State v. Martinez*, 278 Conn. 598, 900 A.2d 485, 491 n. 18 (2006) (noting that Connecticut is in the minority of states which do not follow the *Sullivan* rule).

**14.** The United States Supreme Court in *Richardson v. United States*, 526 U.S. 813, 817–18, 119 S.Ct. 1707, 143 L.Ed.2d 985 (1999), similarly turned to the specific federal statutory language pursuant to which the defendant had been convicted (*viz.*, 21 U.S.C. § 848) to distinguish between "the elements" of the

pertinent crime and "the means" by which the prosecution could prove a particular element. Under the *Richardson* analysis, although a jury may not properly convict a defendant unless it unanimously finds that the prosecution has proven each statutorily required *element* beyond a reasonable doubt, a jury need not unanimously make a decision as to "the means," or underlying facts relevant to a particular element. *Id.* at 817, 119 S.Ct. 1707; *see also Commonwealth v. Perez*, 444 Mass. 143, 825 N.E.2d 1040, 1049 (2005) ("The Supreme Court has been quite clear that neither the Sixth, Eighth, nor Fourteenth Amendment to the United States Constitution requires that a jury be unanimous as to the 'means' by which an element of [a] crime is proved.").

The defendant in *Richardson*, 526 U.S. at 815, 119 S.Ct. 1707, was convicted of the crime of engaging in a "continuing criminal enterprise," and conviction required that there have been a "series of violations." In light of the explicit statutory language, unanimity was required as to each violation having been committed because each "violation" constituted a separate *element* of the crime. *Id.* at 818–19, 824, 119 S.Ct. 1707.

■ The plain language of § 11–23–1 [15] defines murder as "[t]he unlawful killing of a human being with malice aforethought" [16] and classifies it into two degrees. *See Ros,* 973 A.2d at 1161; *State v. Gillespie,* 960 A.2d 969, 975 (R.I.2008). [17] The distinction between murder in the first degree and murder in the second degree is a legislative creation. *Gillespie,* 960 A.2d at 975; *see also* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7 at 476 (2d ed. 2003). Pursuant to § 11–23–1, first-degree murder includes, but is not limited to, "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing" or any murder committed during the commission of certain enumerated felonies. *See State v. Texieira,* 944 A.2d 132, 142 n. 12 (R.I.2008). Any other murder is considered to be second-degree murder. Section 11–23–1; *see Texieira,* 944 A.2d at 142. In other words, second-degree murder is "any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder." *State v. Parkhurst,* 706 A.2d 412, 421 (R.I.1998); *see also Gil-* *lespie,* 960 A.2d at 975; *Texieira,* 944 A.2d at 142.

The elements of murder as set forth in § 11–23–1 may be established on the basis of a number of theories, such as premeditated murder or felony murder. *See Schad,* 501 U.S. at 632, 111 S.Ct. 2491. Indeed, a plurality of the United States Supreme Court in *Schad* concluded that jurors need not agree on the *actus reus* or *mens rea*—specifically, felony murder or premeditated murder—which underlies the verdict, so long as they agree on the "bottom line" elements. *Id.* at 631–32, 111 S.Ct. 2491.

In the instant case, the burden was at all times on the prosecution to prove the presence of the elements set forth in the statute defining murder—*viz.,* (1) that there was an unlawful killing of a human being and (2) that it was done with "malice aforethought." *See* § 11–23–1. It follows that unanimity was required only as to those "bottom line" elements, not as to whether defendant was acting as a principal, as an aider and abettor, or as a coconspirator. *See Schad,* 501 U.S. at 631–32, 111 S.Ct. 2491.

15. The elements of murder originally existed at common law and did not change when the crime was codified. *State v. Mattatall,* 603 A.2d 1098, 1105–06 (R.I.1992).

16. Malice aforethought has been defined as "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *State v. Texieira,* 944 A.2d 132, 142 (R.I.2008) (internal quotations marks omitted); *see also State v. Gillespie,* 960 A.2d 969, 975 (R.I. 2008). Malice aforethought "arise[s] from either an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." *Texieira,* 944 A.2d at 142 (internal quotations marks omitted).

17. The following three theories are recognized as being the potential theoretical bases for a finding of second-degree murder: (1) "those killings in which the defendant formed a momentary intent to kill contemporaneous with the homicide;" (2) those killings that are classified as felony murder involving inherently dangerous felonies that are not expressly listed within § 11–23–1 as constituting first-degree murder; (3) those killings in which the defendant killed with "wanton recklessness or conscious disregard for the possibility of death or of great bodily harm." *Gillespie,* 960 A.2d at 976 (internal quotation marks omitted); *see also Texieira,* 944 A.2d at 142 (explaining that the distinction between first- and second-degree murder lies in that the former requires premeditation for more than a momentary period); *State v. Parkhurst,* 706 A.2d 412, 421 (R.I.1998) (defining second-degree murder in terms of the above-summarized three categories). *See generally* 2 Wayne R. LaFave, *Substantive Criminal Law* § 14.7(e) at 487 (2d ed. 2003).

Moreover, the general rule that jurors need not agree upon the underlying facts "is not only constitutional, it is probably indispensable in a system that requires a unanimous jury verdict to convict." *Id.* at 650, 111 S.Ct. 2491 (Scalia, J., concurring); *see also* Ruth B. Ginsburg, *Special Findings and Jury Unanimity in the Federal Courts,* 65 Colum. L.Rev. 256, 268 (1965) (stating that "[a] formal requirement of [unanimous juror] accord on independent particulars, each of which standing alone would support an ultimate finding, impels formal agreement").[18] In his concurring opinion in *Schad,* Justice Scalia provided the following illuminating example of that proposition:

> "When a woman's charred body has been found in a burned house, and there is ample evidence that the defendant set out to kill her, it would be absurd to set him free because six jurors believe he strangled her to death (and caused the fire accidentally in his hasty escape), while six others believe he left her unconscious and set the fire to kill her." *Schad,* 501 U.S. at 650, 111 S.Ct. 2491.[19]

In light of the defined elements of murder, it is our opinion that the jury was not required to unanimously agree as to whether defendant was guilty of second-degree murder as a principal, or as an aider or abettor, or as a coconspirator.

Finally, in view of the defendant's plea that we "reconsider" our holding in *Davis* in light of the United States Supreme Court's opinions in *Schad* and *Richardson,* we have scrutinized this Court's opinion in *Davis* while bearing in mind the two just-mentioned Supreme Court opinions.[20] We perceive nothing materially inconsistent between said decisions and ours in *Davis*—nor do we understand how our holding therein can properly be said to violate due process principles. In our judgment, *Davis* continues to be "good law."

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm the judgment of the Superior Court. The record in this case may be returned to that tribunal.

Justice INDEGLIA did not participate.

---

18. Many years prior to becoming a Justice of the United States Supreme Court, then-Professor Ruth B. Ginsburg commented on the practicality of the requirement of jury unanimity as to the ultimate issues as follows:
    "[U]nanimity defined in terms of ultimate issues strikes a balance between two extremes: failure to define the objects of unanimity and 'particular fact' definition. The latter, rigidly and unrealistically, equates the collective judgment of twelve with the individual judgment of a single trier. The former, although it would provide maximum leeway for the 'equitable dispensing power' of the jury as a palliative for archaic rules of law, would also constitute an abdication of the judicial function." Ruth B. Ginsburg, *Special Findings and Jury Una-*

*nimity in the Federal Courts,* 65 Colum. L.Rev. 256, 268 (1965).

19. Justice Scalia acknowledged that the principle reflected in his vivid example which is set forth in the text would not be applicable in all situations. He indicated, by way of a further example, that the United States Constitution would not allow for "novel 'umbrella' crimes (a felony consisting of either robbery or failure to file a tax return) where permitting a 6–to–6 verdict would seem contrary to due process." *Schad,* 501 U.S. at 650, 111 S.Ct. 2491 (Scalia, J., concurring).

20. It should be noted that both *Schad* and *Richardson* had been issued well before the issuance of our decision in *Davis.*