STATE

v.

**Juan DIAZ.**

No. 2010–236–C.A.

Supreme Court of Rhode Island.

July 12, 2012.

Jane M. McSoley, Department of Attorney General, for State.

Janice M. Weisfeld, Office of the Public Defender, for Defendant.

Present: SUTTELL, C.J., GOLDBERG, FLAHERTY, ROBINSON, and INDEGLIA, JJ.

## OPINION

Justice ROBINSON, for the Court.

The defendant, Juan Diaz, appeals from a judgment of conviction on one count of second-degree murder and one count of using a firearm while committing a crime of violence. On appeal, the defendant first contends that the trial justice erred in failing to grant his motion for a judgment of acquittal on the second-degree murder charge; the basis for that contention is the defendant's subordinate assertion that the state failed to provide legally sufficient evidence for a jury to find that he acted with malice in connection with the death of the victim. The defendant additionally contends on appeal that the trial justice erred in omitting the phrase "criminal negligence" from his instruction to the jury concerning involuntary manslaughter and instead used "confusing language," which made it difficult for the jury to distinguish the crime of involuntary manslaughter from the crime of murder in the second degree.

For the reasons set forth in this opinion, we affirm in part and reverse in part and vacate the judgment of conviction.

## I

### Facts and Travel

On June 25, 2008, at approximately 9:45 p.m., a telephone call was made by defendant to the main line of the Pawtucket Police Department.[1] In the course of that call, defendant informed the police dispatcher that he had "shot [his] girlfriend in the face by mistake." Asked to clarify that statement, defendant stated: "It's an accident; I shot my girlfriend in the face

1. A recording of defendant's June 25, 2008 telephone call was entered as a full exhibit at trial, and it was played for the jury. In addition, a transcript of the phone call, which was also entered as a full exhibit, was given to the jury to assist the jurors in listening to the audio. For the sake of simplicity, we have taken the above-quoted statements from the transcript of the phone call.

by mistake." He further stated as follows: "[S]he had my gun and when I took it away from her it hit her right in the face." The defendant informed the dispatcher that the victim was not breathing and that she was "throwing up blood." When asked where the gun was located, defendant responded: "[I]t's not around * * *." Eventually defendant revealed that the incident had occurred "last night," and he then more specifically stated that it had occurred "around three in the morning." The defendant further stated that he "didn't know what to do" and had become "nervous." He elaborated that he had "tried to help her" by giving her CPR. The defendant also stated to the dispatcher that he "didn't want to report it * * *."

On June 26, 2008, the Pawtucket police department issued an arrest warrant for defendant. Pursuant to that warrant (and a related warrant which was issued in Albany, New York), defendant was arrested in Albany on the same day as that on which the warrants were issued. At the time of defendant's arrest, an Albany detective administered to defendant his *Miranda* rights. After executing a Waiver of Extradition, defendant was transferred to Rhode Island.

## A

### The Indictment and the Evidence Presented at Trial

On January 23, 2009, a Providence County grand jury indicted defendant for the murder of Mayra Cruz (the victim of the shooting at issue), in violation of G.L. 1956 § 11–23–1 and G.L.1956 §§ 12–29–2 and 12–29–5;[2] he was also indicted for "committing a crime of violence using a firearm [and] discharg[ing] [said] firearm

resulting in the death of Mayra Cruz," in violation of G.L.1956 § 11–47–3.2(b)(3). On February 10, 2010, defendant's trial began in the Superior Court for Providence County. The state presented the testimony of eleven witnesses. Although defendant elected not to testify, he presented the testimony of one witness. We summarize below the trial testimony pertinent to the issues on appeal.

### 1. The Testimony of the Law Enforcement Officers and the Medical Examiner

David Holden, a police officer employed by the City of Pawtucket, was the first witness to testify on behalf of the state. Officer Holden testified that, during his patrol shift on June 25, 2008, between approximately 9:45 p.m. and 10 p.m., he received a call "from dispatch." Officer Holden stated that dispatch informed him that "a male had just called and indicated that he had shot his girlfriend in the face at 3:00 in the morning." Officer Holden further stated that, at that time, it was his belief that the person who had called "was still on scene." He testified that he proceeded to the scene of the reported shooting, which was on Reservoir Street in Pawtucket; he said that, when he arrived, there were already several other police officers present. Officer Holden testified as follows with respect to what he observed when he and the other officers eventually gained access into the apartment:

"I observed a female who was completely naked. She was only wearing her bottom underwear. * * * I immediately reached down to grab her arm to pull her from that apartment, at which time I felt her arm to be completely cold and

---

**2.** The murder of the victim (Mayra Cruz) was charged as a domestic offense pursuant to G.L.1956 chapter 29 of title 12, but the trial justice dismissed the domestic allegation prior to submitting the case to the jury.

her muscles tight and rigid. I believed she passed away, and conveyed that information to [the sergeant on the scene]."

Officer Holden further testified that, because the officers believed that the suspect "could have been inside [the apartment] hiding," they retreated, and the special response team (of which Officer Holden was a member) was called. Officer Holden stated that he eventually reentered the apartment as a member of the special response team; he testified that, upon reentering the apartment, he saw "blood around the room." He further stated that he observed "what appeared to be a gunshot wound under [the victim's] left eye." Officer Holden also testified that he did not observe a gun in the immediate vicinity.[3]

On cross-examination, Officer Holden acknowledged that, in his police report with respect to the above-described incident, he had written that he was initially informed that someone "had just accidentally shot his girlfriend;" he further acknowledged that he had not employed the word "accidentally" while testifying on direct examination.

Joseph Altongy, also a police officer employed by the City of Pawtucket, testified that he had first visited the address where the death of Ms. Cruz occurred "around 8:30" p.m. on June 25, 2008; he stated that it was approximately one hour before he arrived on the scene for the "death investigation." Officer Altongy testified that the reason for his 8:30 visit involved "an unregistered auto;" he stated that it was his responsibility to "check[ ] out the vehicle, make sure if it's registered * * *." Officer Altongy further testified that he "[ran] a registration check on the vehicle," which revealed that the car was "registered to

Mayra Cruz;" he also stated that the registration "[c]ame back suspended." He testified that he then "requested a tow" and "documented the damage that had been sustained to the vehicle." He further explained at trial that he "noticed that the front passenger window had been shattered."

Alexander Chirkov, M.D., a medical examiner for the State of Rhode Island, testified as an expert in forensic pathology. Doctor Chirkov testified that, on June 26, 2008, he performed an autopsy on the body of Ms. Cruz. Doctor Chirkov further testified that, when he first observed her body, he noted that she had a "[g]unshot wound of the face;" he later stated that the bullet had entered the victim's left cheek. He added that there was "stippling around [the] entrance of [the] gunshot wound." He explained that stippling is the "embedding [of] gunpowder in the skin." Doctor Chirkov stated that the area of the stippling was "four by three inches." When asked whether he could determine how far away the gun was from the victim's face when it was fired, Dr. Chirkov responded as follows: "It[ ] depend[s] on the weapons, and this can be from [a] few inches up to * * * one, two, possibly three feet." Doctor Chirkov further stated that the trajectory of the bullet was "[s]lightly down."

When questioned by the prosecutor as to what would be the effect of the gunshot wound on the victim, Dr. Chirkov answered as follows: "[D]ecrease[d] heart rate, also brain edema, and decrease in blood pressure, arterial blood pressure." He proceeded to explain that edema is the "swelling of the brain as [a] result of decreased oxygen," which he said would result in vomiting. Doctor Chirkov also noted that the victim "had some bruises on her right arm and right foot," which bruis-

---

3. The detectives assigned to the case testified at trial that they never recovered a gun, shell casings, or bullets from the scene of the shooting.

ing he determined had been sustained "[w]hen she was alive." When asked how long the victim would have remained alive after sustaining her injury, Dr. Chirkov stated that, based upon his experience and the autopsy that he performed, she would have remained alive for "[a]pproximately 15, 20 minutes." [4]

With respect to how long the victim had been dead by the time that the medical examiner arrived at the scene of the shooting (approximately midnight on June 26, 2008), Dr. Chirkov testified that the body had "complete rigor" when the medical examiner first observed it; Dr. Chirkov stated that that meant that the victim had been "dead at least 12, up to 24 hours." He further testified that he did not observe that the victim had any disease or internal medical problems. Doctor Chirkov also stated that, in his opinion and to a reasonable degree of medical certainty, the cause of the victim's death was a "[g]unshot wound to the head."

On cross-examination, Dr. Chirkov testified that his description of the angle of the shot was "based on [the] normal anatomic position of the body;" he said that he did not know what the position of the body was at the moment of the shot. He further acknowledged that a bullet can "rattle" around once it enters the brain and that such movement could disrupt the original path of the bullet. Doctor Chirkov also testified that none of the victim's fingernails were damaged and that there was no debris observed under any of the fingernail clippings which he had taken. Doctor Chirkov further testified that he did not observe any evidence of defensive wounds on the victim.

Michael Kane, a detective employed by the City of Pawtucket, testified that he was the "on-call" detective on the night of June 25, 2008. Detective · Kane testified that, on that night, while he was at the police station and after the police had been informed that there had been a shooting, one Heather Hill came into the police station and informed him that "she had information about a shooting with her boyfriend." He stated that she gave him the name "Juan Diaz" as being that of her boyfriend. Detective Kane stated that, while he was with Ms. Hill, she received several calls from defendant; Detective Kane added that he was able to listen to some of the phone calls on speaker phone and that he recorded the last two calls that Ms. Hill received. After refreshing his recollection by reviewing his report of the phone calls, Detective Kane testified that he recalled defendant stating during one of the phone calls which he listened to on the speaker phone: "When she gave [the gun] back to me, I grabbed it and it went off." Detective Kane stated that, by contacting defendant's phone company, he was able to determine that defendant was in Albany, New York. Detective Kane testified that he contacted the Albany police and informed them that the Pawtucket police were "looking for an armed fugitive wanted in connection with a shooting death with a firearm that was not recovered." Detective Kane further stated that the Albany police apprehended defendant "outside of some store" at 8 or 8:30 p.m. on June 26, 2008.

### 2. The Testimony of the Acquaintances of Defendant

#### a. Jacinta Fernandes

Jacinta Fernandes, the owner of the house where the body of Mayra Cruz was

---

4. *On cross-examination, Dr. Chirkov testified that the victim lived approximately fifteen to twenty-five minutes after being shot; he said that that conclusion was based upon an "ap-* *proximate calculation of blood lost, and [the] positioning of the body and events such as vomiting present at the scene."*

found, testified that, as of the time of trial, she had lived at that address for fifteen-and-a-half years. She testified that, in March of 2008, she had let defendant stay in her basement apartment; she made an in-court identification of defendant as the man who had been staying in her apartment. Ms. Fernandes further testified that she never executed a rental agreement with defendant; rather, she allowed him to stay in the apartment "until he [got] on his feet," and in return he would "help [her] out."

Ms. Fernandes testified that she had met Ms. Cruz (defendant's former girlfriend) "about three or four times." She further testified that she had last spoken with Ms. Cruz "about one or two days before the incident"[5] around 10:15 p.m.; she stated that Ms. Cruz "was going to the basement" and said hello to her. Ms. Fernandes testified that she awoke the next morning and observed that Ms. Cruz's car was still parked outside of the house on the street. She stated that she then went to work and that later in the day, while she was at her son's football game, she received a phone call from a neighbor informing her that there were police at her house. She testified that she was eventually informed that a woman had been killed in the apartment and that the victim was later identified as Mayra Cruz, whose picture she identified at the police station.

Ms. Fernandes further testified that she did not go back into the apartment until a few weeks prior to the trial, when she decided to clean it up. She testified that, in the course of cleaning up the apartment, she removed a piece of plywood, and a "woman's wallet, bank statement[,] * * * [a]nd * * * a plastic bag" came down from behind the piece of plywood; Ms. Fer-

nandes testified that the name on the documents was "Mayra Cruz." She stated that, after finding the victim's personal documents, she contacted the Pawtucket police and later brought all of the items to the police station.

### b. Heather Hill

Heather Hill testified that she began dating defendant in 2007; she stated that they saw each other "for a couple [of] weeks" and then "broke it off." She further testified that they began dating again in 2008 and that in June of 2008 she was still dating defendant. Ms. Hill testified that, on June 25, 2008, she received several phone calls from defendant; she further stated that she received text messages from him on that day as well. Ms. Hill further testified that, on that day, there was one phone call that she received from defendant that "stood out" to her; she stated that she received that phone call at night. Ms. Hill testified that, during that particular conversation with defendant, he told her "[t]hat he killed a girl." Ms. Hill further testified as follows with respect to that conversation:

"The conversation was saying he killed a girl. * * * He told me it was his ex-girlfriend. Um, they went to a bar to have a couple drinks, and then they went back to his house to watch a couple movies, and, while they went back to his house to watch movies, um, he had a gun, and she had the gun in her hand, and he tried to take it away from her, and he said, 'Give me the f* * * gun.' Um, then he took the gun, and he said something happened to it, and it went off and it shot her, and it shot her, and she started throwing up—throwing up,

---

5. It was later made clear during Ms. Fernandes' testimony that she last saw the victim on the night that she was killed.

bleeding, um, she peed herself. He told me that she died in his arms."

Ms. Hill further testified that defendant told her that "[i]t was his gun, but she hid it from him. She took it from him or something." When asked whether defendant had told her what the victim had done with the gun when she took it from defendant, Ms. Hill responded: "She was just playing around with it, I guess."

After refreshing her memory by referring to the statement that she had given to the police in June of 2008, Ms. Hill clarified her earlier trial testimony by stating that defendant had told her that the victim had "[p]ut [the gun] under the pillow." After Ms. Hill refreshed her memory by referring to her grand jury testimony, she further testified that defendant told her that "[h]e touched something on [the gun]" and that then "[t]he gun went off." She testified that defendant made the following statements to her:

> "It shot her, and she fell down to the ground, I guess. And he tried helping her. He said he tried giving her CPR, and he was with her until the last breath that she took."

Ms. Hill further testified that the next thing that defendant told her was "[t]hat he was leaving;" she elaborated that he said that he was going "[t]o go see his kids before he went to jail." Ms. Hill stated that defendant informed her that he was going to New York and that he was going to get there by "[a] friend." Ms. Hill testified that she told defendant that she was "going to go to the police station" and that he responded " '[g]ood,' because he was going to tell them anyway."

Ms. Hill testified that she "went right to the police station" after receiving the just-mentioned phone call. She stated that she went to the front desk of the Pawtucket police station and "told them" that she had "received a phone call from [her] boyfriend stating he killed somebody." Ms. Hill further testified that, shortly after that, while she was at the police station, she "was receiving a phone call from [defendant];" she elaborated that defendant called her "[m]aybe three or four times" while she was at the police station. She stated that, when she eventually answered one of the phone calls, she "put it on speaker phone so that [Detective Kane] could hear." Ms. Hill testified that, during that conversation, defendant again told her that "he shot his girlfriend or his ex-girlfriend" and that "[h]e was on his way to New York." She stated that defendant also told her that he was going to Virginia.

Ms. Hill testified that Detective Kane recorded some of the phone calls that defendant made to her while she was at the police station in order to "get [defendant] recorded saying that he shot somebody." The CD of the two recorded phone calls that defendant made to Ms. Hill at the police station were played for the jury.[6] During those phone calls, Ms. Hill asked defendant why he did not call 911 earlier; defendant responded that he "was nervous" and that "[t]his morning [he] should've called the ambulance and left." The defendant further stated as follows during the recorded conversations:

> "I'm still keeping the faith like hoping that she is still okay that the cops that the ambulance went there and revived her and she's okay you just don't understand man. I'm so f* * * nervous right now * * *."

The defendant also stated as follows:

> "She was trying to breathe, she was fighting for her last breath she stopped

---

**6.** The jury was also given a transcript of the phone calls to assist the jurors in listening to the audio. Both the CD and the transcript were admitted as full exhibits at trial; for the sake of simplicity, we have taken the above-quoted statements from the transcript of the phone calls.

breathing she was trying to breathe again and I was giving her CPR and f* * * mouth to mouth and nothing, nothing she'll breathe * * *. At the end she just started throwing up she pissed on herself everything all at once. She couldn't go; she couldn't hold it no more like she choked."

When Ms. Hill stated that she did not "understand how it happened," defendant responded that he "took the f* * * gun from her and it went off right near her face." He later stated as follows: "I took [it] off of her hand and it was pointing at her face when I took it off." The defendant also informed Ms. Hill that he was "[s]omewhere in West Virginia."

During the conversations, Ms. Hill also said to defendant: "If you helped her, if you wanted to help her so much you would've called 911 right?" The defendant responded that he "didn't think about 911" and that he "didn't think about none of that s* * *;" he further stated that he "wasn't thinking about murder." The defendant also stated as follows:

"It wasn't even bullet that killed her it was the fact that she couldn't breathe and that I couldn't help her cause I was so f* * * scared so f* * * shocked so f* * * in denial that I didn't even flip a call to ambulance. You think it didn't hurt me? Yo I, to my head right now I * * * a million times I should have called the ambulance that night. I should've called the ambulance and she would've been okay."

The defendant continued to state that "when somebody dies in front of [you,] you don't even think about a[n] * * * ambulance or anything like that. It's what you can do at that time not wait for no f* * * ambulance and s* * *." The defendant

also said that it was "over a stupid argument." When asked by Ms. Hill if they were arguing over the gun, defendant stated as follows:

"Cause she didn't want to give it to me; she didn't want to tell me where it was at. * * * I ain't mad she was just trying to, she knew I was mad she was trying to like get the smiles * * *."

The defendant also stated that "[i]t was a f* * * mistake;" and when Ms. Hill stated that he was going to go to jail, defendant responded as follows:

"So what but I'd rather see my kids then I'd turn myself in at least I got to see my kids. I'm not trying to hide or nothing anything like that and then when I called the cops I gave them my name, I gave them my home information it wasn't like I was hiding or like acted like I didn't do it nothing like that."

The defendant further stated that he "still [didn't] understand how the f* * * this s* * * happened" and that "s* * * happened so fast." The defendant elaborated as follows:

"I was so panicked that when you panic you have no time to think, you don't think about s* * * you just react and that's what I was doing was reacting, trying to help her out."

Ms. Hill then testified that, with respect to her original phone call with defendant in which he informed her of the incident, defendant had told her that he and the victim "were having an argument." Ms. Hill further stated that the argument was concerning "a falling out" between defendant and the victim's brother,[7] and that defendant "was scared that something could happen because [the victim] had the gun."

---

7. On cross-examination, Ms. Hill acknowledged that she had remembered "[a] couple of weeks ago" the conversation with defen-

dant about his argument with the victim's brother.

On cross-examination, Ms. Hill testified that defendant had described the shooting as "an accident." On redirect-examination, Ms. Hill testified that the words that defendant used when describing the incident were "[t]hat Mayra had his gun and he took it back and it went off." Ms. Hill further testified that she recalled that defendant had told her that "[h]e did something to the gun."

### c. David McDonald

David McDonald was the next witness to testify on behalf of the state. Mr. McDonald testified that he was an acquaintance of defendant's. Mr. McDonald testified that he received a phone call from defendant on June 25, 2008[8] at 12 p.m. or 1 p.m.; he stated that defendant "asked [him] if [he] could come and pick [defendant] up and give the keys to his mother." Mr. McDonald further testified that defendant told him at that time that "he was leaving." Mr. McDonald stated that, when he arrived at defendant's home, defendant, who was crying, was "sitting on his steps" with a gym bag; he further stated that defendant "[d]idn't look right." Mr. McDonald testified that defendant "said he got in some trouble."

Mr. McDonald further testified that he gave defendant a ride and dropped him off at a McDonalds in Pawtucket; he stated that it was his belief that defendant "was going to take a bus or a taxi." Mr. McDonald testified that he later received several phone calls from defendant; during one of those phone calls, defendant told him that "he got into a fight with his girlfriend * * * [a]nd broke the window [to her car]." Mr. McDonald later testified that, in subsequent conversations with defendant, he "found out what happened;"

specifically, he stated that defendant told him the following:

"That it was an accident, um, that she had the weapon, and he tried to get it back and it accidently went off."

When asked whether defendant had told him how that happened, Mr. McDonald testified that "[defendant] told [him that] he took the clip out and the slide went back and shot." He further testified that defendant told him that he "[p]ulled the slide back * * * [t]o get one out of the chamber, and it went off." Mr. McDonald stated that defendant told him that "[h]e stayed with her for a while" on his bed; Mr. McDonald later affirmed that defendant had told him that he was with her all night on the bed. Mr. McDonald testified that, after defendant conveyed that information to him, defendant asked him to tell the victim's brother; however, Mr. McDonald did not do so because he "didn't feel [that he] should have to do it."

Mr. McDonald further testified that the next time that he saw defendant was "[i]n jail" in October of 2009. He stated that defendant asked him whether a private investigator could "come see [him]" and that "he told [him] what to tell [the private investigator]." Mr. McDonald explained that he was supposed to tell the private investigator that "[defendant] threw a bag in the dumpster" before Mr. McDonald picked him up on June 25, 2008.

### d. Nial Egan

Nial Egan testified that, in July of 2008, he was incarcerated at the Adult Correctional Institutions (ACI). Mr. Egan testified that, while he was at the ACI, he came in contact with defendant in the "intake

---

**8.** Mr. McDonald later acknowledged that he was under the influence of heroin on both June 25 and June 26, 2008; he also admitted that, when he gave a statement to the police on June 26, 2008 and also when he testified before the grand jury, he did not articulate most of what he testified to at trial regarding the events of June 25, 2008.

holding cell." Mr. Egan stated that he asked defendant why he was at the ACI and that defendant responded as follows: "I'm the guy that shot the girl." After refreshing his recollection with a statement that he gave to the Pawtucket police in August of 2008, Mr. Egan testified that defendant "showed [him] * * * how he shot her;" Mr. Egan stated that defendant used his right hand to point to the left side of his face. Mr. Egan also testified that defendant said to him: "I hope this doesn't screw up my visits with my girlfriends."

Mr. Egan further testified that he and defendant were "on the same tier;" he stated that, as a result, they "went for the breaks together." He testified that he spoke with defendant "twice a day for five or six days" while they were on break. Mr. Egan stated that defendant told him that "[h]e had a[n] ongoing conflict with [the victim's] brothers," and that he was concerned that they "were going to kill [him] when he got out of jail." Mr. Egan also stated that defendant and the victim were arguing about the conflict with her brothers the night of her death and that "[t]hey started hitting each other." Mr. Egan also testified as follows with respect to his conversations with defendant concerning the night of the victim's death: "I guess it got pretty heated. I guess they were arguing about the brothers, then arguing about the girlfriend."

Mr. Egan further testified that defendant told him that he thought that his gun was in the dresser and that, when he realized that the gun was not there, he "flipped out." Mr. Egan stated that defendant told him that he then started verbally and physically fighting with the victim about the gun; specifically, defendant told him that he was "slapping" her and that "[t]hey were both beating each other up." Mr. Egan further testified that defendant told him that the victim had hidden the gun "under the mattress;" and that she "ultimately gave him the gun." With respect to what defendant said had happened next, Mr. Egan testified as follows:

"She started hitting him. She was hitting him in the face. He pushed her away, push her away. She hit him in the face again. He shot her in the face. And he said the gun just went off.

" * * *

"[H]e had told me that she had fell to the ground. He was holding her for a couple minutes. She was trying to talk, gurgling blood, but she couldn't, and then he let her down, and she kept looking at him, and he kept facing back and forth, and he said he closed her eyes because it was freaking him out that she was looking at him."

Mr. Egan testified that defendant next told him that he "packed his bags and went to his sister's house." He further testified that defendant told him that "before he hit the highway he threw [the gun] in a dumpster * * *." When asked whether defendant had described the gun to him, Mr. Egan stated that defendant had said that it was "a black Colt" with a "wooden handle" and was either a ".22 or .25 caliber."

On cross-examination, Mr. Egan clarified that defendant had told him that he and the victim were "fighting over the gun," and that he (Mr. Egan) may have used the word "struggling" when he described the conversation to the Attorney General's office.

### e. Castabile Florio, Jr.

Castabile Florio, Jr. was the only witness to testify for the defense. Mr. Florio testified that he knows defendant and that he saw him on June 24, 2008. He stated that, on that day, he saw defendant at "the Cabana bar" and that he was with "his girlfriend." He further testified that the

conduct between defendant and his girl-friend was "[n]ormal" and that they were "[h]aving a good time" and were "affectionate." He stated that both he and the couple left the bar "close to 1:00." He stated that he walked outside with defendant and that defendant "got in the car with [him]" and that they "followed [the girlfriend in her car] about a block down the street to [defendant's] house." Mr. Florio stated that, at that time, he said "goodnight" to both defendant and his girl-friend and "they both went in the house."

## B

### The Conclusion of the Trial, the Verdict, and the Subsequent Travel of the Case

On February 11, 2010, after both parties had presented their witnesses and exhibits, defendant moved for a judgment of acquittal.[9] After hearing arguments from both parties, the trial justice ultimately granted defendant's motion as to the charge of first-degree murder, but he permitted the charges of second-degree murder and involuntary manslaughter to be submitted to the jury (along with the charge of using a firearm while committing a crime of violence).

The jury began deliberations on February 12, 2010; and, later that same day, it found defendant guilty of both second-degree murder and of using a firearm while committing a crime of violence, thereby causing Ms. Cruz's death. The trial justice subsequently sentenced defendant to life imprisonment on the second-degree murder count and to life imprisonment on the charge of using a firearm while committing a crime of violence, the latter sen-tence to be served consecutively to the second-degree murder sentence. The judgment of conviction and commitment subsequently entered. Thereafter, defendant timely appealed.

## II

### Standards of Review

#### A

### Motion for a Judgment of Acquittal

■ In undertaking a review of a trial justice's denial of a motion for a judgment of acquittal, "we employ the same standards as the trial court." *State v. DeOliveira*, 972 A.2d 653, 663 (R.I.2009); *see also State v. Cipriano*, 21 A.3d 408, 420 (R.I.2011); *State v. Lynch*, 19 A.3d 51, 56 (R.I.2011). That standard requires us to "view the evidence in the light most favorable to the prosecution, giving full credibility to its witnesses, and drawing all reasonable inferences consistent with guilt." *State v. Pitts*, 990 A.2d 185, 189 (R.I.2010) (internal quotation marks omitted); *see also State v. Rodriguez*, 10 A.3d 431, 433 (R.I.2010); *State v. Ros*, 973 A.2d 1148, 1159 (R.I.2009). Then, if that examination of the evidence "reveals sufficient evidence to warrant a jury verdict of guilt beyond a reasonable doubt, the trial justice's denial of the motion should be upheld." *Cipriano*, 21 A.3d at 420 (internal quotation marks omitted); *see also State v. Reyes*, 984 A.2d 606, 616 (R.I.2009); *State v. Imbruglia*, 913 A.2d 1022, 1027 (R.I.2007).

#### B

### Jury Instructions

■ It is well established that this Court reviews jury instructions in a *de*

9. The defendant moved for a judgment of acquittal pursuant to Rule 29 of the Superior Court Rules of Criminal Procedure. Rule 29(a)(1) reads in pertinent part as follows: "The court on motion of a defendant or on its own motion shall order the entry of judgment of acquittal of one or more offenses charged in the indictment, information, or complaint, after the evidence on either side is closed, if the evidence is insufficient to sustain a conviction of such offense or offenses."

*novo* manner. *State v. Figuereo,* 31 A.3d 1283, 1288 (R.I.2011); *see also State v. Payette,* 38 A.3d 1120, 1124 (R.I.2012); *State v. Adefusika,* 989 A.2d 467, 475 (R.I. 2010). In conducting that review, "this Court will not consider a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *Figuereo,* 31 A.3d at 1288 (internal quotation marks omitted); *see also State v. Delestre,* 35 A.3d 886, 891 (R.I.2012); *Ros,* 973 A.2d at 1166. Therefore, we "examine the instructions in their entirety to ascertain the manner in which a jury of ordinary intelligent lay people would have understood them * * *." *Delestre,* 35 A.3d at 891 (omission in original) (emphasis and internal quotation marks omitted); *see also State v. Carpio,* 43 A.3d 1, 10 (R.I.2012); *Cipriano,* 21 A.3d at 423; *Ros,* 973 A.2d at 1166.

We shall uphold a trial justice's challenged jury instructions when such instructions "adequately cover the law and neither reduce nor shift the state's burden of proof." *Payette,* 38 A.3d at 1124 (internal quotation marks omitted); *see also Cipriano,* 21 A.3d at 423; *State v. Linde,* 876 A.2d 1115, 1128 (R.I.2005). It is the duty of the trial justice to "ensure that the jury charge sufficiently addresses the requested instructions and correctly states the applicable law." *Lynch,* 19 A.3d at 58 (internal quotation marks omitted); *see also Carpio,* 43 A.3d at 10; *Ros,* 973 A.2d at 1166. However, "even if we conclude that a jury instruction was erroneous, reversal is warranted only if a jury could have been misled to the prejudice of the complaining party." *Adefusika,* 989 A.2d at 475 (internal quotation marks omitted); *see also Delestre,* 35 A.3d at 891; *State v. Graham,* 941 A.2d 848, 855 (R.I.2008).

## III

## Analysis

## A

## The Motion for a Judgment of Acquittal

On appeal, defendant contends that "[i]t was abundantly clear from all of the evidence adduced at trial that [defendant] did not intend to shoot or kill his girlfriend, Mayra Cruz, but that the shooting was a tragic accident." The defendant further argues that "[t]his accidental shooting may well have been one for which criminal culpability could attach on the theory of involuntary manslaughter, but it was an unintentional homicide without any attendant circumstances that can amount to legal malice." On that basis, defendant contends that the trial justice erred in denying his motion for a judgment of acquittal on second-degree murder.

The crime of murder existed at common law, but the delineation of murder into degrees was effectuated by the General Assembly in its codification of the crime. *See Delestre,* 35 A.3d at 900 & n. 15; *see also* § 11–23–1; *State v. Gillespie,* 960 A.2d 969, 975 (R.I.2008); *State v. Mattatall,* 603 A.2d 1098, 1105–06 (R.I.1992). Murder is defined by § 11–23–1 as "[t]he unlawful killing of a human being with malice aforethought." Pursuant to that section, first-degree murder is "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing" or any murder committed during the commission of certain enumerated felonies. Section 11–23–1; *see also Delestre,* 35 A.3d at 900; *State v. Texieira,* 944 A.2d 132, 142 n. 12 (R.I.2008).

Section 11–23–1 goes on to define second-degree murder as any murder other than first-degree murder. On the basis of that statutory definition, we have stated

that second-degree murder is "any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder." *State v. Parkhurst*, 706 A.2d 412, 421 (R.I.1998); *see also Delestre*, 35 A.3d at 900; *Gillespie*, 960 A.2d at 975.

█ This Court has defined malice aforethought as "an unjustified disregard for the possibility of death or great bodily harm and an extreme indifference to the sanctity of human life." *Texieira*, 944 A.2d at 142 (internal quotation marks omitted); *see also Delestre*, 35 A.3d at 900 n. 16; *Gillespie*, 960 A.2d at 975; *Mattatall*, 603 A.2d at 1106. Malice aforethought arises from either "an express intent to kill or to inflict great bodily harm or from a hardness of the heart, cruelty, wickedness of disposition, recklessness of consequence, and a mind dispassionate of social duty." *Texieira*, 944 A.2d at 142 (internal quotation marks omitted); *see also Delestre*, 35 A.3d at 900 n. 16; *Gillespie*, 960 A.2d at 975–76.

This Court has recognized three possible "theories of second-degree murder, each grounded in a different aspect of malice aforethought." *Gillespie*, 960 A.2d at 976; *see also Delestre*, 35 A.3d at 900 n. 17; *Parkhurst*, 706 A.2d at 421. The first theory "involves those killings in which the defendant formed a momentary intent to kill contemporaneous with the homicide." *Gillespie*, 960 A.2d at 976; *see also Delestre*, 35 A.3d at 900 n. 17. The second theory "includes felony murder for inherently dangerous felonies that are not expressly listed within the statutory defini-

tion of first-degree murder." *Gillespie*, 960 A.2d at 976; *see also Delestre*, 35 A.3d at 900 n. 17. The third theory of second-degree murder involves "those killings in which the defendant killed with wanton recklessness or conscious disregard for the possibility of death or of great bodily harm."[10] *Delestre*, 35 A.3d at 900 n. 17 (internal quotation marks omitted); *see also Gillespie*, 960 A.2d at 976.

█ Accordingly, for a conviction of second-degree murder to be upheld, the prosecution must prove, beyond a reasonable doubt, that the defendant acted with malice aforethought; and, in attempting to so prove, the prosecution may rely on any of the three above-mentioned theories. *See Parkhurst*, 706 A.2d at 421.

█ As we begin our review of the instant case, we are mindful that, where a motion for a judgment of acquittal is concerned, we are to "view the evidence in the light most favorable to the prosecution * * *." *Pitts*, 990 A.2d at 189 (internal quotation marks omitted); *see also Rodriguez*, 10 A.3d at 433. That being so, the evidence presented by the prosecution at trial established that defendant was holding a loaded gun that was pointed at the face of the victim and that he did "something" to the gun before the fatal shot was fired; in fact, defendant himself admitted to shooting the victim in the face. Acting in such a manner can absolutely be found to be an act conducted with "wanton recklessness or [a] conscious disregard for the possibility of death or of great bodily

---

10. The following is the exact language used by the trial justice in instructing the jury on the malice aforethought aspect of second-degree murder:

"Malice may manifest itself in different ways. An act is committed with malice when it is committed with rash disregard for the life of another, or with an unjustified

disregard for the probability of death or great bodily harm. Malice may also be proved by circumstances that demonstrate the extreme indifference to the sanctity of human life. Finally, malice may be implied or inferred from all the surrounding circumstances, including the manner and means by which death was brought about."

harm."[11] *See Mattatall,* 603 A.2d at 1107 ("The evidence supports a legitimate inference that sometime during that night Mattatall held a loaded .357 magnum, a howitzer among handguns, aimed point blank at John Scanlon's face when the gun discharged. It is this conduct that constitutes a recklessness of consequence, capable of supporting an inference of malice aforethought."). Furthermore, the testimony of Mr. Egan and the detectives assigned to the case established that defendant concealed the weapon. It is well established that "[m]alice can be inferred from the attending circumstances that surround a defendant's conduct * * *." *State v. Banach,* 648 A.2d 1363, 1368 (R.I.1994); *see also State v. Wilding,* 638 A.2d 519, 522 (R.I.1994); *Mattatall,* 603 A.2d at 1107; *State v. McGranahan,* 415 A.2d 1298, 1302 (R.I.1980). With that premise in mind, we hold that the evidence produced at trial, viewed in a light most favorable to the prosecution, could support a verdict of guilty beyond a reasonable doubt with respect to the charge of second-degree murder. Therefore, the trial justice did not err when he denied defendant's motion for a judgment of acquittal on the second-degree murder charge.

## B

### The Jury Instructions

The defendant argues that the trial justice erred when he omitted the term "criminal negligence" from his instruction concerning involuntary manslaughter and instead used the words "wanton or reckless." The defendant further argues that the trial justice used "confusing language" in his involuntary manslaughter instruction and, according to defendant, "ren-

dered it impossible for a jury of ordinary, intelligent lay people to distinguish involuntary manslaughter from murder in the second degree."[12] The state responds by contending that, in *State v. Hallenbeck,* 878 A.2d 992 (R.I.2005), this Court "explicitly approved" the language that the trial justice used in the instant case.

■■■■ At issue is the following language which the trial justice used when instructing the jury on the involuntary manslaughter charge:

"If, after having reviewed all the evidence, you're not satisfied beyond a reasonable doubt as to the existence of any malice on the part of the defendant, you cannot find him guilty of second-degree murder. And, it is at this point of your deliberations that you should consider whether or not the defendant committed the lesser offense of manslaughter.

"Generally speaking, manslaughter is the unlawful but unintentional killing of a human being without malice or premeditation. A person who recklessly does an act that results in the death of another human being is guilty of manslaughter even though he did not contemplate such a result. Nothing more is required than an intentional doing of an act which, by reason of its wanton or reckless character, exposes another person to injury, and causes injury or death."

Immediately after the jury was instructed, during a side-bar conference outside the presence of the jury, defense counsel objected to, *inter alia,* the just-quoted instruction, citing . the written objection which he had previously filed with respect to the trial justice's proposed instructions.[13]

---

11. *State v. Delestre,* 35 A.3d 886, 900 n. 17 (R.I.2012) (internal quotation marks omitted).

12. *See* footnote 10, *supra.*

13. The defendant's written objection filed with respect to the involuntary manslaughter charge stated as follows: "Defendant objects to the court's charge of manslaughter and

The trial justice also instructed the jury with respect to the defense of accident; in doing so, he stated as follows:

"The defendant contends that Mayra Cruz was killed accidentally. Absent any wanton or reckless conduct by the defendant, accidental death will excuse a defendant from criminal liability. If you find that the defendant caused Mayra Cruz's death, but that he did so unintentionally and accidentally, and without having acted heedlessly or recklessly, then you must find him not guilty of all the charges. Bear in mind that the defendant does not have to prove that Miss Cruz died accidentally. Rather, it is the State's burden to persuade you beyond a reasonable doubt that her death was not an accident."

 Our cases, and notably *State v. Hockenhull,* 525 A.2d 926 (R.I.1987), whose language defendant contends should have been imparted to the jury, have defined the crime of involuntary manslaughter as "an unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony or in the performance of a lawful act with criminal negligence." *Id.* at 929; *see also Torres v. State,* 19 A.3d 71, 75 n. 7 (R.I.2011); *Hallenbeck,* 878 A.2d at 1008; *State v. Lambert,* 705 A.2d 957, 963 (R.I.1997). The just-quoted term "criminal negligence" means "conduct which is such a departure from what would be that of an ordinarily prudent or careful man [or woman] in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences." *State v. Ortiz,* 824 A.2d 473, 485 (R.I.2003) (alteration in original) (internal quotation marks omitted). In sum, "involuntary man-

slaughter occurs when, without malice aforethought, an unintentional death results from a voluntary act, one that a reasonable person, acting in a similar manner, would not expect to cause death or serious injury." *Id.* at 486.

It is true that this Court has previously affirmed a manslaughter charge which contained the terms "wanton or reckless." *See Hallenbeck,* 878 A.2d at 1009. In *Hallenbeck,* in which the weapon was a knife and death was caused by a stab wound to the femoral artery or vein, *see id.* at 1003–04, we addressed the specific issue of whether "the trial justice erred by failing to distinguish voluntary and involuntary manslaughter," thereby allegedly confusing the jury. *Id.* at 1008. However, it was notably only "[i]n the circumstances of [that] case" that we approved the manslaughter instructions containing the terms "wanton" and "reckless" and held that they "adequately covered the law." *See id.* at 1009. This Court in *Hallenbeck* also addressed the issue of "whether [the] defendant was prejudiced by the trial justice's failure to explicitly define the terms 'wanton' and 'reckless.'" *Id.* In ruling on that issue, we determined that the terms "wanton" and "reckless" were of "such common usage as to provide sufficient guidance to a jury of ordinary intelligent lay people in discharging its responsibility to render a verdict." *Id.*

However, at no point in *Hallenbeck* did this Court address the subject of the trial court's having not included the concept of "criminal negligence" in the involuntary manslaughter charge; neither did we address whether the absence from the instruction of a reference to that concept rendered it impossible for a jury of ordinary intelligent lay people to distinguish

relies upon that described in *State [v.] Hockenhull,* 525 A.2d 926 [(R.I.1987)]." The objection additionally stated: "Defendant main-

tains that the words 'criminal negligence' is what is required in a manslaughter charge."

involuntary manslaughter from murder in the second degree. In the instant case, we are presented with an issue that is entirely different from that which was present in *Hallenbeck;* and, therefore, our holding in that case is not controlling with respect to the case at bar.

▉ We hold that, in light of the facts of the instant case, the trial justice, in instructing the jury concerning involuntary manslaughter, committed reversible error in failing to include an adequate reference to the concept of criminal negligence. It is true that a trial justice "is not required to use any specific words or phrases when instructing the jury;" however, the instructions actually given must "adequately cover the law." *Adefusika,* 989 A.2d at 477 (internal quotation marks omitted); *see also Figuereo,* 31 A.3d at 1290. Additionally, "a trial justice's refusal to grant a request for jury instruction[s] is not reversible error *if the requested charge is fairly covered in the general charge.*" *Cipriano,* 21 A.3d at 423 (emphasis added) (internal quotation marks omitted); *see also State v. Brown,* 898 A.2d 69, 82 (R.I. 2006); *Hallenbeck,* 878 A.2d at 1008.

▉ Our body of law with respect to involuntary manslaughter has made it very clear that involuntary manslaughter includes the concept of criminal negligence. *See Hockenhull,* 525 A.2d at 929 (defining involuntary manslaughter as "an unintentional homicide without malice aforethought, committed either in performance of an unlawful act not amounting to a felony *or in the performance of a lawful act with criminal negligence* " (emphasis added)); *see also Torres,* 19 A.3d at 75 n. 7 (reciting the language utilized in *Hocken-*

*hull,* including the term "criminal negligence," as constituting the definition of involuntary manslaughter); *Hallenbeck,* 878 A.2d at 1008 (quoting the definition of involuntary manslaughter as provided in *Hockenhull*—which includes the term "criminal negligence"); *Ortiz,* 824 A.2d at 485; *Parkhurst,* 706 A.2d at 423; *State v. Kaner,* 463 A.2d 1348, 1351 (R.I.1983). And, in the case at bar, defendant requested in his written objection to the proposed instructions that the trial justice use the involuntary manslaughter language from *Hockenhull,* 525 A.2d at 929; and he specifically contended that a reference to the concept of "criminal negligence" was required in that charge. Additionally, defendant objected once the trial justice gave the jury the involuntary manslaughter instruction.

We further note that this case involved a claim that two people were fighting over a loaded firearm and a defense that the weapon "accidentally" discharged. We conclude that the evidence in this case requires an instruction that would inform the jury that "conduct which is such a departure from what would be that of an ordinarily prudent or careful man [or woman] in the same circumstances as to be incompatible with a proper regard for human life, or an indifference to consequences" [14] can amount to the crime of involuntary manslaughter.

The trial justice, in instructing the jury on conduct which would satisfy the malice element of second-degree murder, employed the terms "rash" and "unjustified." [15] Examining the challenged portion in the context of the entire charge, we are satisfied that a jury of ordinary intelligent

14. *See State v. Ortiz,* 824 A.2d 473, 485 (R.I. 2003) (alteration in original) (internal quotation marks omitted) (characterizing the above-quoted language as constituting the definition of criminal negligence).

15. *See* footnote 10, *supra.*

lay people would not have understood that conduct to be separate and distinct from actions of a "wanton or reckless character," [16] as described in the involuntary manslaughter charge. We have previously stated as follows:

> "Trial justices, in dealing with a criminal negligence charge, should avoid the use of such terms as 'wanton recklessness' and 'willful disregard' of the harmful consequences because such a state of mind goes beyond negligence. Such a state of mind can supply the element of malice necessary to raise a homicide to the level of common-law murder." *State v. Robbio*, 526 A.2d 509, 514 n. 2 (R.I. 1987); *see also State v. Cacchiotti*, 568 A.2d 1026, 1030 (R.I.1990); *State v. Iovino*, 524 A.2d 556, 558 (R.I.1987).

Although there is a legally recognized distinction between the terms "wanton or reckless character" and "wanton recklessness" (as a theory of second-degree murder), there may not be such a distinction between those terms in the minds of ordinary intelligent lay persons. And, the distinction between malice as described in the instant case (a "rash disregard for the life of another, or * * * an unjustified disregard for the probability of death or great bodily harm") and the description of conduct which would merit a verdict of involuntary manslaughter was made even less clear when the trial justice failed to impart the concept of criminal negligence to the jury; that is especially so when he instead instructed that "an intentional doing of an act which, by reason of its wanton or reckless character, exposes another person to injury, and causes injury or death" would suffice to find defendant guilty of involuntary manslaughter. *See Hockenhull*, 525 A.2d at 929 ("Involuntary manslaughter resulting from criminal negligence is a lesser degree of homicide than an act that may constitute murder as the result of the wanton recklessness of the accused."). Therefore, in light of the facts of this case, the instructions that were given, when viewed as a whole, could have misled a jury composed of ordinary intelligent lay people to the prejudice of the defendant.

Accordingly, it is our judgment that, in order to have properly weighed the charges brought against the defendant, it was crucially important that the jury in this case receive an involuntary manslaughter instruction that included the concept of criminal negligence, thereby creating a distinct and separate charge from that which was given for murder in the second degree.[17] We hold that the trial justice erred in declining to include said concept in his instruction on involuntary manslaughter. For these reasons, we vacate the defendant's judgment of conviction.

## IV

### Conclusion

For the reasons set forth in this opinion, we affirm in part and reverse in part and vacate the judgment of conviction; we remand the case to the Superior Court. The record in this case may be returned to that tribunal.

---

**16.** The American Heritage Dictionary of the English Language defines the term "wanton," in the pertinent definition, as follows: "Marked by unprovoked, gratuitous maliciousness; capricious and unjust." The American Heritage Dictionary of the English Language 1938 (4th ed.2009). That dictionary also defines "reckless" as "[h]eedless or careless;" and it gives the word "rash" as a synonym for "reckless." *Id.* at 1460.

**17.** *See* footnote 10, *supra.*