June 29, 2018

**Supreme Court**

No. 2016-352-C.A.
(P1/10-1155A)

|  |  |
|---|---|
| State | : |
| v. | : |
| Michael Patino. | : |

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Tel. 222-3258 of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                              :

v.                              :

Michael Patino.                    :

Present:  Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ.

## O P I N I O N

**Justice Flaherty, for the Court.**    The defendant, Michael Patino, appeals from a judgment of conviction for second-degree murder, in violation of G.L. 1956 § 11-23-1, after a jury found him guilty of murdering his girlfriend's six-year-old son.  For that crime, he was sentenced to a term of life imprisonment.  On appeal, the defendant claims that he is entitled to a new trial because the trial justice made three errors, two of which relate to the trial justice's jury instructions and one of which arises from the admission of certain testimony at trial.  For the reasons set forth in this opinion, we affirm the judgment of conviction.

## I

### Facts and Travel

A little after five o'clock in the evening on Sunday, October 4, 2009, a six-year-old boy named Marco Nieves was pronounced dead at Hasbro Children's Hospital.  According to the autopsy performed by then-Chief Medical Examiner of the State of Rhode Island, Thomas Gilson, M.D., the cause of death was peritonitis, which is a medical term that describes

inflammation around the stomach cavity. The manner of death was deemed to be homicide. In Dr. Gilson's opinion, the peritonitis that led to Marco's death was the result of the infliction of a substantial amount of blunt force to the abdomen. As a string of text messages between defendant and his girlfriend, Trisha Oliver, later revealed, that blunt force came from defendant's fist.[1]

At some point in the afternoon of October 3, Ms. Oliver's son, Marco, began vomiting. Despite the boy's distress, Ms. Oliver brought him to church, where a number of people told her that Marco did not look well. The defendant, meanwhile, was spending the evening hanging out at his friend's car shop. He had been with Marco and his daughter, Ms. Oliver's other child, while Ms. Oliver ran errands that morning.[2] The defendant did not return to Ms. Oliver's Cranston apartment until the early morning hours of October 4. However, between the time that he left and the time that he returned to his girlfriend's apartment, defendant and Ms. Oliver exchanged a series of damning text messages that revealed in stark and vulgar terms what had happened to Marco Nieves.

At about a quarter to five o'clock on the afternoon of October 3, after texting with defendant over an unrelated issue, Ms. Oliver sent defendant the following text message: "of course [Marco] is gonna be all hurt and cryin cuz u f****n beat the crap out of him im not wit that sh*t[.]" Minutes later, defendant responded, with his feelings emphasized by all capital letters: "I PUNCH DAT LIL B***H 3 TIMES AND DAT WAS IT. DA HARDEST 1 WAS ON

---

[1] Of note, this is not defendant's first foray into this Court's docket. In 2014, this Court vacated in part and affirmed in part a pretrial ruling of a justice of the Superior Court suppressing a host of text messages found on defendant's girlfriend's cell phone. *See State v. Patino*, 93 A.3d 40 (R.I. 2014). The text messages that were the subject of that decision were admitted into evidence and used extensively throughout defendant's trial.

[2] The defendant's parental rights with respect to his and Ms. Oliver's daughter have been terminated. *See In re Jazlyn P.*, 31 A.3d 1273 (R.I. 2011).

HIS STOMACH CUZ HE MOVED.  BUT LET HIM B A MAN AND NOT A LIL B***H LIKE U[.]"  The defendant then issued a follow-up message, again in all capital letters: "WAT KIND OF DISCIPLINE OR ANYTHIN U GONNA KNO[.]"   Ms. Oliver responded immediately, informing defendant that Marco had not complained to her about being in pain; rather, as she texted, he was just throwing up.  She, too, issued a follow-up: "idk wat u did but u hurt [h]is stomach real bad[.]"  The defendant's response: "I TOLD U.  I WENT 2 PUNCH HIM ON HIS BACK AGAIN AND HE MOVED AND I HIT HIM ON HIS STOMACH."

After sending that text, defendant attempted to offer an alternative explanation for why Marco might be sick to his stomach.  The defendant wrote to Ms. Oliver: "ITS PROLLY SINCE HE HAD ATE DATS Y.  MY BAD IM REALY SORRY ABOUT DAT[.]"  Ms. Oliver texted defendant back, stating that Marco was making sounds and throwing up a foamy substance; she also informed defendant that the boy's eyes were rolling toward the back of his head.  At this point, it was just after 5 p.m. on Saturday, October 3.  It was clear to defendant's girlfriend that her son Marco was in terrible distress.

But while Marco's condition continued to worsen, the couple contented themselves with text messages.  Their text chain shows that Ms. Oliver was becoming increasingly concerned with Marco; he was still throwing up, his stomach was "madd tight[,]" and after briefly falling asleep, he had vomited on the bed sheets.  The defendant suggested a solution: She should leave Marco alone for a while and let settle whatever food that he had eaten.  Meanwhile, Ms. Oliver noted that her son's vomit was dark and that his blanket needed to be washed.  The defendant, though, was undeterred as he proposed cures for Marco's distress.

The defendant suggested, first, that Ms. Oliver should give Marco some water.  After being informed that Marco had thrown up again, defendant offered a twist: Ms. Oliver should

awaken Marco and give him water with lemon. Then, defendant suggested that she should rub Marco's stomach. When notified that the stomach rub had failed, defendant again asked Ms. Oliver to give Marco a drink of water. Time wore on, and his proposed remedies were to no avail. At about six o'clock that evening, defendant texted: "MAKE HIM LIKE EXERCISE[.]" Exasperated, Ms. Oliver responded: "yes mike idk wat else 2 do[.]"

She then sent defendant the following text: "mike he is in madd pain u had 2 hit him real hard mike wtf[.]" The defendant responded: "I HIT HIM DA SAME WAY EVERYWHERE BUT ITS DAT HE MOVED AND I HIT HIM BAD[.]" Ms. Oliver queried: "wat if somethin happened 2 him his eyes r rolin he cant even talk he says he is doin reall badd[.]" The defendant then implored his girlfriend to relax and calm down. Ms. Oliver's response was to ask defendant to come to her home and help take care of Marco; defendant agreed to do so. And, apparently recognizing her predicament, Ms. Oliver ominously typed out one more message to defendant: "wat if i got2 take him 2 da hospi[ta]l wat will i say and dos marks on his neck omg[.]"[3]

Despite his agreement to do so, defendant did not return to Ms. Oliver's home until hours later, around three or four in the morning. While Ms. Oliver continued texting with defendant, and as Marco continued to suffer, defendant whiled away the evening enjoying drinks and hanging around his friend's car shop in Central Falls, alternating between drinking with his friends and by himself at his mother's home.

Early the next morning, October 4, a dispatcher at the Cranston Fire Department received a distressing emergency call. On the other end of the line was Trisha Oliver, and she related disturbing news: her son was not breathing. Within minutes, a crew of four men from the Cranston Fire Department arrived at Ms. Oliver's apartment. Private David Brouillard, an

---

[3] As this Court previously has noted, this text message "was never actually delivered" because of "a lack of funds on [Ms.] Oliver's phone[.]" *Patino*, 93 A.3d at 44 n.3.

- 4 -

emergency medical technician, was one of the first to respond to the scene. Upon rushing into Ms. Oliver's apartment, Pvt. Brouillard first observed a young boy on the couch. The boy was unresponsive. Private Brouillard also encountered a woman, who he later confirmed was Ms. Oliver, and another child. Ms. Oliver, Pvt. Brouillard noted, "appeared nervous and upset." There was also another person in the apartment; a man who Pvt. Brouillard noticed was "quiet, standing in the corner, not saying anything." That man, it turned out, was defendant.

As soon as Pvt. Brouillard entered the apartment, he went to the boy on the couch. The boy "was not breathing and he had no pulse." While Pvt. Brouillard continued checking for a pulse, Ms. Oliver, upset and nervous, told him that the boy "had been up all night vomiting and complaining of stomach pain." Two of the other responders, Privates Christopher Coutu and Mark Bouchard, also hurried over to the boy to administer aid. The fourth firefighter on the scene, Lieutenant James Woyciechowski, radioed in the boy's status to the incoming rescue personnel.

With time of the essence, Pvt. Brouillard began "working on the [boy's] airway," while Pvt. Coutu continued to search for a pulse. As Pvt. Brouillard searched for any obstructions in the boy's airway, he opened a breathing bag to ventilate him. Private Bouchard also readied an automated external defibrillator (AED), which is a device designed to check the heart's rhythm and, if needed, deliver electric shocks to reset it. However, after Pvt. Bouchard pushed the button marked "analyze" on the AED, it read: "no shock advised." Neither Pvt. Brouillard nor Pvt. Coutu found a pulse.

As Pvt. Brouillard and Pvt. Coutu ventilated the boy and continued administering CPR, the rescue arrived at the scene. Lieutenant Thomas Rimoshytus, who arrived with the rescue personnel and who had been informed that the boy was not responding to aid, instructed: "Scoop

him up and let's go." With the AED pads still attached to the boy's body, Pvt. Coutu cradled the child and rushed him out to the just-arrived ambulance. Inside the ambulance, the boy was placed on a stretcher, and the rescuers administered CPR and reconnected the AED. Still, as Pvt. Brouillard testified, the boy's body looked "limp and totally lifeless."

During all of this commotion, with his girlfriend hysterical, his girlfriend's son unresponsive, and a number of firefighters and rescue personnel rushing about, defendant appeared to be calm and quiet. As a number of the firefighters observed, defendant remained off to the side, standing in the hallway, with his hands in his pockets.

En route to the hospital, the rescue personnel applied the AED again. This time, pushing the analyze button resulted in a reading of "shock advise[d]." As Lt. Rimoshytus later testified, "[w]e shocked him, and he was still pulseless and not breathing * * *."

Just before 6:30 a.m., the rescue arrived at Hasbro Children's Hospital in Providence. Medical records reveal that the boy did not regain a documented pulse until 7:20 a.m. Linda Snelling, M.D., the Chief of Pediatric Critical Care and Medical Director of the Pediatric Intensive Care Unit at Hasbro Children's Hospital, was the boy's attending physician that morning. She described his condition as "[g]rave." The boy underwent CT scans of his brain and abdomen, and he was later moved to the Pediatric Intensive Care Unit.

As Dr. Snelling testified, the CT scans showed that there was the presence of "free air" in the boy's abdomen. Free air, Dr. Snelling explained, indicates an "abdominal perforation, usually an intentional perforation." While the free "air itself hurts," she testified that "the bigger problem is that if you have a perforation or a hole in your intestine, what is inside the intestines spills out into the abdominal cavity and it's full of bacteria." That, according to Dr. Snelling, "can cause a lot of irritation, * * * infection, and it can cause a lot of tissue swelling. It can

change the blood flow to the organs, and depending upon where in the intestine the hole is located, it can also spill acids from the digestive system into the abdominal contents."

Over the course of the next several hours, the boy's condition did not improve. As the morning turned to afternoon, according to Dr. Snelling, he was on "[e]very kind of life support system except for a heart bypass machine. He had adrenaline to make his heart beat. He had a ventilator to breathe for him. * * * He had blood products. He was getting a lot of resuscitation." However, despite the heroic efforts of medical personnel, Marco Nieves was later pronounced dead.

Back at the apartment, Lieutenant (then-sergeant) Matthew Kite of the Cranston Police Department had arrived just as the rescue left for the hospital. He approached the apartment and spoke with Ms. Oliver, who was visibly upset and was pacing outside her apartment building. Ms. Oliver then agreed to walk him through her apartment. Once inside, Lt. Kite observed two individuals, defendant and the infant daughter of defendant and Ms. Oliver. The defendant, according to Lt. Kite, was seated calmly on the couch. Lieutenant Kite then walked with Ms. Oliver room by room, observing that one bed had been stripped of its sheets, which were piled on the floor. He also spotted "a white waste basket with a coffee ground type substance visible in the bottom." In the bathroom, he viewed the same "brown coffee grind type substance in the toilet." The object of his search, Lt. Kite explained, was to find the cause of Marco's injury, which he initially suspected was "an ingestion of a toxic substance" such as a "household cleaner."

After the apartment walk-through, Ms. Oliver left for the hospital. Lieutenant Kite, now in the kitchen area, began making small talk with defendant, who was standing near the kitchen. As Lt. Kite scanned the living room, he noticed that there were a number of cell phones lying

about.  Then, the home phone, a landline, rang, and defendant answered it.  After he hung up, defendant, apparently recognizing that he would soon be leaving, changed his daughter's diaper and began packing a diaper bag.  Meanwhile, a cell phone on the kitchen counter caught Lt. Kite's attention, either by making a sound or vibration, or because the screen lit up.  The defendant, who had finished packing the diaper bag, sat back down on the couch and did not respond to the cell phone.  When Lt. Kite picked up the cell phone from the counter, its screen indicated that a new message had been received.  After a few clicks, he read the message but quickly returned the cell phone to the counter.  The information that Lt. Kite gleaned from that text message was incriminating and it gave him cause to contact police headquarters.  Although he had initially been searching for household items that Marco may have ingested, the text message indicated that there was a different, more malicious cause of injury.[4]

The defendant was transported to the Cranston police station, where he agreed to speak with two detectives.   In his interview with the detectives, defendant did not have much to offer. He confirmed that he had been out the evening and night of Saturday, October 3, and that he had returned to Ms. Oliver's apartment sometime between three and four o'clock in the morning. The defendant also said that Ms. Oliver had informed him that Marco had been vomiting.[5]

On April 2, 2010, close to six months after Marco Nieves died, defendant was indicted by a grand jury for Marco Nieves's murder, in violation of §§ 11-23-1 and 11-23-2.  After a trial in the Superior Court held in April 2015, defendant was convicted of murder in the second degree. Thereafter, the trial justice sentenced defendant to life imprisonment.  The defendant appealed, arguing that the trial justice erred (1) in instructing the jury with respect to second-degree felony

---

[4] Later, the police obtained a warrant to search and seize the cell phone Lt. Kite had picked up. *See Patino*, 93 A.3d at 45.
[5] The questioning was video recorded, a recording that the jury would later view at trial.

murder; (2) in instructing the jury with respect to causation; and (3) by admitting testimony about prior bruising that had been observed on Marco's body.

## II

### The Jury Instructions

The defendant's first two assignments of error arise out of the trial justice's jury instructions. He first argues that the trial justice erred with respect to her instruction on second-degree felony murder in three respects: (1) that the instruction on second-degree felony murder deprived him of due process because, even though the indictment charged him with murder in violation of § 11-23-1, it included neither a charge of second-degree felony murder nor a charge of the predicate felony to second-degree felony murder, felony child abuse; (2) that there should have been no instruction on second-degree felony murder at all because, under the merger doctrine, the predicate felony for second-degree felony murder—in this case, felony child abuse—should have merged into the homicide; and (3) that the trial justice erred by describing the injury required to establish felony child abuse as one that was "however slight."

The defendant also takes issue with the trial justice's instruction on causation. According to defendant, the instruction on proximate cause did not sufficiently explain to the jury the lynchpin of his defense—that is, whether Marco Nieves's death was proximately caused by defendant, as the state had argued, or by Ms. Oliver's failure to obtain medical care for the child, as defendant maintained.

### A

### Standard of Review

We review jury instructions *de novo*. *State v. Delestre*, 35 A.3d 886, 891 (R.I. 2012). "In conducting that review, 'it is our role to *examine the instructions in their entirety* to ascertain

the manner in which a jury of ordinary intelligent lay people would have understood them * * *.'" *Id.* (quoting *State v. John*, 881 A.2d 920, 929 (R.I. 2005)).  As we have explained, we "will not examine a single sentence apart from the rest of the instructions, but rather the challenged portions must be examined in the context in which they were rendered." *Id.* (quoting *State v. Kittell*, 847 A.2d 845, 849 (R.I. 2004)).  Moreover, "[a]n erroneous charge warrants reversal only if it can be shown that the jury could have been misled to the resultant prejudice of the complaining party."  *State v. Florez*, 138 A.3d 789, 793 (R.I. 2016) (quoting *State v. Burnham*, 58 A.3d 889, 897 (R.I. 2013)).  As long as the trial justice's jury instructions "adequately cover[ed] the law[,]" "we will uphold them[.]"  *Delestre*, 35 A.3d at 891 (quoting *State v. Ensey*, 881 A.2d 81, 95 (R.I. 2005)).

## B

### Second-Degree Felony Murder

The trial justice began her charge to the jury with a definition of murder: "Murder, whether murder in the first degree or murder in the second degree, is the unlawful killing of a human being with malice aforethought."  Accordingly, the trial justice explained, to convict defendant of murder, either in the first or second degree, the jury had to find that the state proved beyond a reasonable doubt: (1) "that the [d]efendant willfully caused the death of another human"; and (2) "that the [d]efendant acted with malice aforethought."

The trial justice then distinguished between murder in the first degree and murder in the second degree.  To find defendant guilty of first-degree murder, the trial justice told the jurors, they needed to conclude that defendant "acted with premeditation[,]" meaning an "intent to kill * * * which * * * existed for more than a mere moment."  If, the trial justice explained, a

defendant "commits a murder but does not act with premeditation having a duration of more than a mere moment, * * * [he] is guilty of murder in the second degree * * *."

The trial justice then turned to that with which defendant has taken issue on appeal: the instruction on second-degree felony murder. She explained that if the jury did not find defendant guilty of first-degree murder, or if the jury did not find that the state had proven that defendant acted with the requisite intent to kill for second-degree murder, then the jury still had to "consider whether the [s]tate has proven [d]efendant guilty of second degree felony murder." As the trial justice clarified for the jury, "[t]hat's murder in the second degree also, but it's on a different theory."

She first summarized the doctrine of second-degree felony murder:

> "Under our law, the criminal offense of second degree murder may also be established under what is known as the Felony Murder Rule. If a [d]efendant kills someone in the course of or in attempting to commit an inherently dangerous felony, then that killing is by law considered second degree murder even if the [d]efendant did not intend to kill another human being.
> "Under this doctrine the [s]tate need not prove malice or intent to kill. So you can still find the [d]efendant guilty of second degree murder even if the [s]tate does not prove malice or intent to kill, if the Doctrine of Felony Murder applies."

The trial justice then explained that:

> "In order to convict [d]efendant of second degree murder under the Felony Murder Doctrine, the [s]tate must prove the following elements beyond a reasonable doubt: Number l, that the [d]efendant caused the death of Marco Nieves; and Number 2, that he did so while committing or attempting to commit an inherently dangerous felony. In order to convict the [d]efendant of second degree murder under the Felony Murder Doctrine, the [s]tate does not have to prove that the [d]efendant acted with malice aforethought or even that he intended to kill anybody.
> "* * *
> "The only intent required is that the [d]efendant intended to commit the underlying felony, the one that is inherently dangerous * * *."

- 11 -

In this case, the predicate felony for the trial justice's second-degree felony murder instruction was felony child abuse, a violation of G.L. 1956 § 11-9-5.3—which is also known as "Brendan's Law." The trial justice described Brendan's Law as follows:

> "I instruct you that under Rhode Island law, where a person having care of a child knowingly or intentionally inflicts any physical injury upon the child, *however slight*, he or she is guilty of a felony * * *." (Emphasis added.)

She then explained that Brendan's Law contained an exception: "If the injury inflicted does not constitute a serious bodily injury and the injury arises from the imposition of non-excessive corporal punishment, then the person has not committed a felony."

Significantly, as the trial justice neared the end of her instruction on second-degree felony murder, she noted that: "The decision as to whether the felony is inherently dangerous or reflects conscious disregard for the risk to human life rests on [the] fact[s] of the case." And, as she told the jury, in determining whether the child abuse alleged in this case constituted an inherently dangerous felony, "you should consider all of the facts and circumstances proven at trial, including the nature and severity of the alleged punishment, the size and age of the child, as well as any disparity in size and strength between the victim and the [d]efendant."

The trial justice also imparted an instruction on involuntary manslaughter. In doing so, she reiterated that "it is unlawful for a person having care of a child to knowingly or intentionally inflict physical injury on the child however slight the injury." Drawing on her earlier instruction on felony child abuse, she then instructed the jury that there were only two "circumstances pertinent to this case where you could determine that the [d]efendant is guilty of involuntary manslaughter due to criminal negligence": (1) when "the injury does not constitute serious

bodily injury"; and (2) when "the injury results from the imposition of non-excessive corporal punishment." With that, the trial justice concluded her instructions to the jury.

But before sending the jury out for a recess, the trial justice summoned the attorneys for a sidebar. After briefly clarifying an instruction on an issue irrelevant to defendant's appeal, the trial justice turned to defendant's attorney, inquiring whether he had any objections to the jury instructions. He began by lodging the following objection:

> "Judge, I think the first issue that comes to my mind is that felony murder rule that was not charged in the Indictment, and my understanding on the felony murder rule is a typical situation where a person goes into a bank, robs a bank and then one of the people shoots the security guard, so even though in that particular case if the driver of the car didn't go into the bank he would be liable because of that shooting. And I think the facts of this case [are] very different. Felony murder rule doesn't apply in this particular case."

However, the trial justice disagreed, explaining that: "I do think that it does. I think there's case law to that effect, and I think it only makes sense because the [d]efendant requested a charge on manslaughter, actually requested an involuntary manslaughter[] charge." This, according to the trial justice, had created a dilemma. If she did not instruct the jury on second-degree felony murder, she explained, there would be "a huge gap" in the jury instructions with respect to the jury's decision regarding defendant's intent. The trial justice explained that, because an instruction on voluntary manslaughter was clearly unwarranted, if she gave instructions on first-degree murder, second-degree murder, and involuntary manslaughter, but did not give an instruction on second-degree felony murder, then the jury "could determine that [defendant] acted unlawfully" in a manner that "rose to the level of [a] felony * * * in violation of Brend[a]n's Law" but also find him not guilty of involuntary manslaughter. "So[,]" the trial justice reasoned, "we would have a situation where [defendant] would be convicted if he acted

- 13 -

lawfully but criminally negligent and acquitted if he acted unlawfully amounting to a felony * * *." That, the trial justice concluded, made no sense. Accordingly, she overruled defendant's objection.

On appeal, defendant argues that the trial justice's instruction on second-degree felony murder was erroneous in three ways, any of which, in his view, warrants a new trial. First, defendant contends that that instruction deprived him of his due process rights—namely, his right to fair notice and his right to present a meaningful defense—because the indictment was silent as to second-degree felony murder or as to felony child abuse, which the trial justice used as the predicate felony for the second-degree felony murder instruction in this case.

As we have explained, "[m]urder is defined by § 11-23-1 as '[t]he unlawful killing of a human being with malice aforethought.'" *State v. Diaz*, 46 A.3d 849, 861 (R.I. 2012). Under § 11-23-1, "first-degree murder is '[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing' or any murder committed during the commission of certain enumerated felonies." *Id.* (quoting § 11-23-1). Second-degree murder, on the other hand, is "any killing of a human being committed with malice aforethought that is not defined by statute as first-degree murder." *Id.* at 862 (quoting *State v. Parkhurst*, 706 A.2d 412, 421 (R.I. 1998)). Of particular relevance to this case, it is well settled that "[t]his Court has recognized three possible 'theories of second-degree murder, each grounded in a different aspect of malice aforethought.'" *Id.* (quoting *State v. Gillespie*, 960 A.2d 969, 976 (R.I. 2008)). We have distilled those theories of second-degree murder to the following formulation:

> "The first theory involves those killings in which the defendant formed a momentary intent to kill contemporaneous with the homicide. * * * The second theory includes felony murder for inherently dangerous felonies that are not expressly listed within the statutory definition of first-degree murder. * * * The third theory of second-degree murder involves those killings in which

the defendant killed with wanton recklessness or conscious disregard for the possibility of death or of great bodily harm." *Id.* (internal quotation marks omitted).

It is true that the indictment in this case did not expressly charge defendant with second-degree felony murder or with felony child abuse, but only that he caused the death of Marco Nieves, in violation of § 11-23-1, which proscribes murder in both the first and second degree. However, based on our caselaw describing the three ways in which the state can prove second-degree murder, *see Diaz*, 46 A.3d at 862, we cannot say that the trial justice's jury instructions deprived defendant of fair notice of the charges asserted against him. Second-degree felony murder is a well-established theory of proving the requisite intent for second-degree murder, and, in this case, there was overwhelming evidence adduced at trial that could lead a jury to conclude that defendant's physical abuse of six-year-old Marco Nieves constituted felony child abuse, in violation of Brendan's Law—just as the trial justice instructed. Although it appears that the trial justice *sua sponte* instructed the jury regarding felony child abuse, it is significant that she did not instruct the jury that he could be convicted of it as a standalone criminal offense. Rather, the trial justice instructed that felony child abuse could serve as the predicate felony for second-degree felony murder. Accordingly, we reject defendant's contention that he was deprived of fair notice and an opportunity to present a meaningful defense solely because the trial justice gave an instruction on second-degree felony murder based on felony child abuse.[6]

Next, defendant contends that, based on the doctrine of merger, there should not have been an instruction on second-degree felony murder and, he argues, the trial justice erred when she gave such an instruction. As a threshold matter, we have grave reservations as to whether

---

[6] Moreover, our review of the evidence in this case also demonstrates that the jury could just have easily determined that defendant's conduct amounted to "wanton recklessness or conscious disregard for the possibility of death or of great bodily harm[,]" another theory of second-degree murder. *State v. Diaz*, 46 A.3d 849, 862 (R.I. 2012).

this issue is properly before us, given the rather broad objection that defendant made to the instruction at sidebar. *See State v. Crow*, 871 A.2d 930, 935 (R.I. 2005). Nonetheless, even if the objection were properly preserved, it is our opinion that the trial justice did not err on this issue.

As defendant has correctly indicated, the doctrine of merger, as articulated by the California Supreme Court in *People v. Ireland*, 450 P.2d 580 (Cal. 1969), provides "that a second degree felony-murder instruction may not properly be given when it is based upon a felony which is an integral part of the homicide and which the evidence produced by the prosecution shows to be an offense included *in fact* within the offense charged." *Ireland*, 450 P.2d at 590. However, we note that this doctrine has evolved since *Ireland* was decided, in part because of confusion surrounding the interplay between merger and second-degree felony murder. For instance, in *People v. Sarun Chun*, 203 P.3d 425 (Cal. 2009), the California Supreme Court, in an effort to clarify that confusion, reframed its merger doctrine:

> "When the underlying felony is assaultive in nature, * * * we now conclude that the felony merges with the homicide and cannot be the basis of a felony-murder instruction. An 'assaultive' felony is one that involves a threat of immediate violent injury. * * * In determining whether a crime merges, the court looks to its elements and not the facts of the case. Accordingly, if the elements of the crime have an assaultive aspect, the crime merges with the underlying homicide even if the elements also include conduct that is not assaultive." *Sarun Chun*, 203 P.3d at 443.

In Rhode Island, however, we have eschewed the California approach and have taken a different approach to second-degree felony murder. Rather than have "the court look[] to [the] elements [of the predicate felony] and not the facts of the case[,]" *Sarun Chun*, 203 P.3d at 443, we leave it to the factfinder "to consider the facts and circumstances of the particular case to determine if [a] felony was inherently dangerous in the manner and the circumstances in which it

was committed * * *."[7] *State v. Stewart*, 663 A.2d 912, 919 (R.I. 1995). If the factfinder determines that a defendant committed an inherently dangerous felony, then that felony may serve as the predicate felony for second-degree felony murder. *Id.*

We have considered this approach to be more straightforward than the merger doctrine, and it avoids the potential for confusion that has resulted from its adoption elsewhere. *See, e.g.*, *Sarun Chun*, 203 P.3d at 427. *But see State v. Jones*, 155 A.3d 492, 508 (Md. 2017) (adopting the merger doctrine "to maintain the integrity of the different levels of culpability of murder and manslaughter and to ameliorate its perceived harshness"). Our jurisdiction's check on the harshness of the felony murder rule is the requirement that "[t]o serve as a predicate felony to a charge of second-degree murder, a felony that is not specifically enumerated in § 11-23-1 must * * * be an inherently dangerous felony." *Stewart*, 663 A.2d at 918. If the factfinder concludes that the underlying felony was in fact inherently dangerous, then "[t]he intent to commit the underlying felony will be imputed to the homicide, and a defendant may thus be charged with [and convicted of] murder on the basis of the intent to commit the underlying felony." *Id.* at 920; *see also Diaz*, 46 A.3d at 862. Nothing defendant has raised in this case has persuaded us to alter that approach.

In the record before us, there is substantial evidence upon which the jury could have relied to determine that defendant committed an inherently dangerous felony. The defendant, a two-hundred-twenty-pound adult man, punched Marco Nieves, a six-year-old boy standing four-feet-one and weighing seventy-six pounds, with such force that the blow ruptured Marco's intestine. It is difficult to fathom how those facts do not demonstrate the commission of an

---

[7] In *State v. Stewart*, 663 A.2d 912 (R.I. 1995), we expressly "decline[d] [the] defendant's invitation to adopt the California approach in determining whether a felony is inherently dangerous to life and thus capable of serving as a predicate to a charge of second-degree felony murder." *Stewart*, 663 A.2d at 919.

inherently dangerous felony, in violation of Brendan's Law. Because we decline to adopt the merger doctrine as it has been formulated by the California Supreme Court, the question of whether a felony is inherently dangerous in Rhode Island remains in the hands of the factfinder, not the court. *Stewart*, 663 A.2d at 919, 920.

The final issue that defendant presses on appeal with respect to the instruction on second-degree felony murder arises out of the trial justice's use of the phrase "however slight" when she was discussing Brendan's Law. Again, despite the preservation problem relating to this issue, we will briefly address why defendant's argument misses the mark.

Brendan's Law provides, in pertinent part, that:

> "(b) Whenever a person having care of a child, as defined by § 40-11-2(2), whether assumed voluntarily or because of a legal obligation, including any instance where a child has been placed by his or her parents, caretaker, or licensed or governmental child placement agency for care or treatment, knowingly or intentionally:
> "(1) Inflicts upon a child serious bodily injury, shall be guilty of first degree child abuse.
> "(2) Inflicts upon a child any other physical injury, shall be guilty of second degree child abuse." Section 11-9-5.3(b).

Despite the nature of the injury inflicted, it is a felony to commit either first-degree child abuse—which requires proof of a "serious bodily injury"—or second-degree child abuse—which requires proof of merely "any other physical injury[.]" Sections 11-9-5.3(b), (e). A "serious bodily injury" is one that:

> "(1) Creates a substantial risk of death;
> "(2) Causes protracted loss or impairment of the function of any bodily parts, member or organ, including any fractures of any bones;
> "(3) Causes serious disfigurement; or
> "(4) Evidences subdural hematoma, intercranial hemorrhage and/or retinal hemorrhages as signs of 'shaken baby syndrome' and/or 'abusive head trauma.'" Section 11-9-5.3(c).

The term "other physical injury" is "any injury, other than a serious bodily injury, which arises other than from the imposition of nonexcessive corporal punishment." Section 11-9-5.3(d).

Here, in instructing the jury on Brendan's Law, the trial justice stated that, save for the exception regarding nonexcessive corporal punishment, "under Rhode Island law, where a person having care of a child knowingly or intentionally inflicts any physical injury upon the child, *however slight*, he or she is guilty of a felony * * *." (Emphasis added.) Later, the trial justice reiterated that "it is unlawful for a person having care of a child to knowingly or intentionally inflict physical injury on the child however slight the injury." However, although the descriptor "however slight" may have deviated to some extent from the statutory definition of any "other physical injury" set forth in Brendan's Law, we are of the opinion that the trial justice's jury instruction, when viewed *in its entirety*, was not erroneous. *See Delestre*, 35 A.3d at 891.

When she instructed the jury, the trial justice quoted directly from Brendan's Law in defining "serious bodily injury."[8] It follows, then, that anything other than a "serious bodily injury"—meaning *any* "other physical injury"—could be understood as a physical injury "however slight" inflicted upon a child. Although those are not the precise words set forth in the statute, in our view, the trial justice's characterization of "any other physical injury" as being synonymous with an injury "however slight" did not so distort the statute's language as to mislead or confuse the jury. *See Florez*, 138 A.3d at 793. As we have said on innumerable occasions, it is not our role to pick apart single phrases from the rest of the jury instructions and search for error; rather, it is our task to examine the jury instructions "in the context in which

---

[8] The trial justice explained that: "For purposes of [Brendan's] [L]aw, the term 'serious bodily injury' means physical injury that creates a substantial risk of death or causes protracted loss or impairment of the function of any body parts, member or organ, including any fractures of any bones[,] or causes serious disfigurement."

they were rendered." *Delestre*, 35 A.3d at 891 (quoting *Kittell*, 847 A.2d at 849). Viewed through that prism, it is clear to us that the trial justice's instruction to the jury on second-degree felony murder, using Brendan's Law as the predicate felony, on the whole, was detailed and thorough, and more than adequately covered the law. *Id.*

## C

## Causation

We turn now to what was defendant's primary defense at trial: whether his conduct was the proximate cause of Marco Nieves's death. He contends that the trial justice's instruction on that issue was erroneous.

At trial, the thrust of defendant's case was that, although his punch may have injured Marco, it was Marco's mother, Ms. Oliver, who ultimately caused the child's death because she failed to get Marco the medical care that, defendant argued, would have saved his life. To support that defense, defendant proffered expert testimony from Elizabeth Laposata, M.D., who specializes in forensic pathology and who once served as Rhode Island's chief medical examiner. Doctor Laposata testified that, in her opinion, Marco's injury was "a survivable injury[,]" and that, had he been brought to the hospital within hours of his being injured, "surgery could have been performed to sew up the hole [in his duodenum] * * *." But, Dr. Laposata explained, because "the time period" from when Marco was injured to when he was brought to the hospital—which she estimated was fifteen or sixteen hours—"was so long[,] he went into shock and could not be revived." Of note, Dr. Laposata also testified that Marco Nieves "died from peritonitis due to an untreated perforation of the duodenum due to blunt force trauma."

In support of his causation defense, defendant also pointed to a text message that Ms. Oliver sent to him in the midst of their lengthy exchange on October 3, 2009. At 5:17 p.m., after

writing that Marco's stomach was tight, his eyes were rolling, and he was still vomiting, Ms. Oliver sent defendant the following text message: "please tell me wea my blunt is cuz im stress like wtf i cut down a whole lot mike like seriously i take 1 or 2 hits and it relaxxes me[.]"[9]

Based on Dr. Laposata's testimony and Ms. Oliver's concern about obtaining marijuana, which apparently outweighed her concerns for medical care for Marco, defendant argued that the proximate cause of Marco's death was not his own conduct, but rather Ms. Oliver's failure to get Marco medical treatment. The trial justice included an instruction on the doctrine of intervening causation in her charge to the jury. As she described it,

> "The Doctrine of Independent Intervening Cause recognizes that a person's misconduct may not be a proximate cause of the death of another if it's rendered remote in the causal sense because of an intervening act or acts of a third person. However, for an intervening act or omission of a third person to relieve a [d]efendant of criminal responsibility for causing a death, the intervening act must be the sole proximate cause of the death."

On appeal, defendant argues, as he did to the trial justice, that the instructions to the jury on causation were insufficient because they did not require the jury to consider whether Ms. Oliver's failure to obtain medical treatment was an unforeseeable, intervening cause of Marco Nieves's death. In other words, defendant contends that the trial justice erred in explaining the circumstances under which Ms. Oliver's conduct could replace his own as the proximate cause of Marco's death. We do not agree.

Although independent intervening cause is a doctrine that most often arises in the arena of civil cases, *e.g.*, *Contois v. Town of West Warwick*, 865 A.2d 1019, 1027 (R.I. 2004), we are not wholly without precedent in other contexts. In *In re Leon*, 122 R.I. 548, 410 A.2d 121

---

[9] "Blunt" is slang for a cigar filled with marijuana. As we recently explained, "[i]f one empties the contents of a cigar, it can be filled with marijuana and resealed. The finished product is a blunt." *State v. Blandino*, 171 A.3d 21, 25 n.6 (R.I. 2017).

(1980), the respondent, who had been adjudicated to be delinquent by reason of second-degree murder after he helped set a fatal fire in a youth correctional facility, argued that the youth facility's lack of training regarding fire emergencies, coupled with the fire department's delayed response to the fire, served as an intervening cause which superseded and replaced the foreseeable consequences of his fire-starting conduct. *In re Leon*, 122 R.I. at 550, 555-56, 410 A.2d at 123, 125, 126. However, this Court rejected that argument, affirming the trial justice's decision to exclude evidence regarding the facility's training on fire emergencies and the fire department's response time. *Id.* at 556, 557, 410 A.2d at 126.

Analogizing the respondent's argument in that case "to those raised in situations in which the victim of a violent act has sought medical treatment which" does not "cur[e] * * * his wounds" or save his life, *In re Leon*, 122 R.I. at 556, 410 A.2d at 126, we explained that:

> "An injury from which the victim bleeds to death is the proximate cause of the decease even if the loss of blood might have been stopped had medical aid been promptly obtained. Obviously the fact that a doctor was not at hand to render immediate aid cannot be regarded as a superseding cause; but the result is not dependent upon unavailability. *The question is not what would have happened, but what did happen*[] *and there can be no break in the legally-recognized chain of causation by reason of a possibility of intervention which did not take place, because a negative act is never superseding*. Moreover, an injury is the proximate cause of resulting death although the deceased would have recovered had he been treated by the most approved surgical methods, or by more skil[l]ful methods, or with more prudent care, or with a different diet and better nursing, or with proper caution and attention." *Id.* at 556-57, 410 A.2d at 126 (emphasis added) (quoting *Perkins*, Criminal Law 715-16 (2d ed. 1969)).

Therefore, "proximate cause is not superseded, nor the act that produced it excused, by the failure on the part of those who might have assisted, cured, or rescued the victim to exercise a higher quality of skill or efficiency or a more appropriate response in the face of emergency when their actions might have favorably affected the result." *Id.*

The Supreme Judicial Court in our sister state of Massachusetts has explained the doctrine in this way: "The general rule is that the intervening conduct of a third party will relieve a defendant of culpability only if such an intervening response was not reasonably foreseeable." *Commonwealth v. Garcia*, 18 N.E.3d 654, 668 (Mass. 2014) (quoting *Commonwealth v. Rosado*, 747 N.E.2d 156, 163 (Mass. 2001)). Nonetheless, "[i]f 'death follows as a consequence of [an individual's] felonious and wicked act, it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result.'" *Id.* (quoting *Commonwealth v. McLeod*, 477 N.E.2d 972, 985 (Mass. 1985)). We embrace that analysis here.

With that in mind, after carefully examining the trial justice's instructions to the jury regarding causation in their entirety, it is our opinion that they adequately and correctly covered the law. *See Delestre*, 35 A.3d at 891. It is clear to us that the jurors were properly informed about the law of proximate cause and the doctrine of intervening causation and that they were availed of the opportunity to find that, as defendant had argued, Ms. Oliver's conduct superseded defendant's as the proximate cause of Marco Nieves's death. After listening to the competing experts presented by defendant and by the state,[10] and after absorbing the trial justice's thorough instructions on this issue, the jury determined that the physical beating inflicted by defendant had proximately caused Marco's death.

Indeed, based on the evidence in this case, it is difficult for us to fathom how the punch of a two-hundred-twenty-pound adult male to the stomach of a small child—so forceful in its impact that it ruptured the child's duodenum—could be replaced by that child's mother's

---

[10] As noted above, Dr. Thomas Gilson testified that the cause of Marco's death was peritonitis and that the manner of death was homicide. Similarly, Dr. Linda Snelling, who treated Marco, testified that, although Marco could have survived had he been brought to the hospital while he was still alive, he nonetheless died from "an out-of-hospital cardiac arrest as a result of his abdominal injury, and that prolonged arrest led to his multiple organ failure and his death."

delayed call to emergency services as the proximate cause of death. To borrow from what the Supreme Judicial Court of Massachusetts wrote in *Garcia*, Marco Nieves's "death follow[ed] as a consequence of [defendant's] felonious and wicked act, [and] it does not alter its nature or diminish its criminality to prove that other causes cooperated in producing the fatal result." *Garcia*, 18 N.E.3d at 668 (quoting *McLeod*, 477 N.E.2d at 985). The focus for the jury in this case was on "not what would have happened, but what did happen * * *." *In re Leon*, 122 R.I. at 556, 410 A.2d at 126 (quoting *Perkins*, *supra*, at 715-16). As the trial justice correctly informed the jury, Ms. Oliver's failure to seek medical treatment for her son until nearly a day after defendant's assault on her son did not necessarily break the chain of proximate cause.

Furthermore, what defendant's argument overlooks is that he, too, had a duty to care for Marco. The trial justice described precisely that point of law to the jury:

> "[I]f you find that the [s]tate has met all of the other elements of the crime charged, even if you find that the failure to obtain medical treatment was a cause of Marco's death, that finding will not preclude a verdict of guilty. You may also consider whether the [d]efendant himself had a duty to assist Marco in getting medical treatment and whether Marco died because he breached that duty. One person can have a legal duty to assist a victim in getting medical treatment. There are certain situations in which a duty is created to render aid, to obtain medical assistance for another if needed."

One of those situations, as the trial justice explained, occurs when a "duty [is] imposed" based on "the person's relationship to the injured party, such as the custodial parent of a sick child." The trial justice instructed that Marco's mother, Ms. Oliver, fell into that category.[11] The other

---

[11] *See State v. Robat*, 49 A.3d 58, 80 (R.I. 2012) (citing *State v. McLaughlin*, 621 A.2d 170, 175 (R.I. 1993), as "expressly recognizing [that] the parent-child relationship * * * constitut[es] an exception to the rule that there is 'no general duty of care imposed on a person to protect, render assistance, or to otherwise be responsible for another's safety and welfare' and * * * that a 'parent may be guilty of criminal homicide for failure to call a doctor for his [or her] sick

situation is when a "duty [is] imposed upon the person who created the peril * * *." It is here that defendant's duty of care came into play.

In the case of a person who "caused the injury that necessitated the medical treatment[,]" the trial justice explained, the duty arises "so long as": "First, the perpetrator is aware that the victim needs medical assistance for the injury"; "second, the perpetrator is aware that the victim is not receiving that assistance"; "[a]nd third, the perpetrator has an opportunity * * * to render aid * * * [or] to obtain that medical treatment." Finally, the trial justice stated, "If you find these facts to be proven, then as a matter of law [d]efendant, along with Marco's mother, had a duty to assist Marco in getting medical treatment."

The trial justice appropriately explained to the jury how Ms. Oliver, as Marco's mother, and defendant, as the perpetrator of Marco's injury, could have each had a duty to seek medical treatment for him. And as the trial justice correctly told the jury, even if Ms. Oliver breached her duty to her son, if the jury nonetheless found that defendant breached his duty to Marco, then he could not "escape criminal responsibility * * *." Here, just as "[a]n injury from which the victim bleeds to death is the proximate cause of the decease *even if* the loss of blood might have been stopped had medical aid been promptly obtained[,]" *In re Leon*, 122 R.I. at 556, 410 A.2d at 126 (emphasis added) (quoting *Perkins*, *supra*, at 715-16), so too is it true that defendant's punch could have served as the proximate cause of Marco's death even if Ms. Oliver could have potentially obtained medical care that might have saved the child's life.

Therefore, in this case, we perceive no error in the trial justice's jury instructions on causation. Having been properly charged, the jury found that Ms. Oliver's conduct did not absolve defendant of the consequences of his own acts.

child'"). In May 2016, Ms. Oliver pleaded guilty to manslaughter and received a twenty-year sentence of imprisonment, with 105 months to serve and the remainder suspended.

## The Testimony about Prior Bruising

The defendant's final argument is that the trial justice erred when she allowed Alexandra Correia, the girlfriend of Marco Nieves's father, Rafael Nieves, to testify about an incident in which she observed a softball-sized bruise on Marco's back. The defendant argues that this "other acts" evidence was inadmissible under Rule 404(b) of the Rhode Island Rules of Evidence, and, even if it were admissible, it should have been excluded under Rule 403 of the Rhode Island Rules of Evidence because its relevance was substantially outweighed by its prejudicial impact on the jury. On the other hand, the state contends that, not only was the testimony admissible under Rule 404(b) and not unfairly prejudicial under Rule 403, but it also became relevant because of a question defendant himself asked of Guida Andrade, Ms. Correia's mother. As a result, the state argues, defendant "opened the door" to Ms. Correia's testimony.

In our opinion, the record establishes that defendant did indeed open the door to Ms. Correia's testimony. Prior to trial, the state had filed, but later withdrew, a motion *in limine* to introduce testimony from Ms. Correia. As noted above, Ms. Correia is the girlfriend of Marco's father and also is the daughter of Ms. Andrade. She was prepared to testify to an incident where she observed bruising on Marco's back; however, before trial, the state decided not to pursue that line of inquiry.

During the cross-examination of Ms. Andrade, who had testified for the state, the following exchange took place between her and defense counsel:

> "[DEFENSE COUNSEL:] When [Marco] would come for Sunday dinner, what time would he be taken home?
> "[MS. ANDRADE:] Marco would go home between five p.m. or eight p.m.
> "[DEFENSE COUNSEL:] Did he take a bath before he left to go home?

"[MS. ANDRADE:]  No.

"[DEFENSE COUNSEL:]     Never took a bath at your house?

"[MS. ANDRADE:]  No, not to my recollection.  I've never given him a bath, no.

"[DEFENSE COUNSEL:]     Okay.  *Did you ever see any bruises on him?*

"[MS. ANDRADE:]  *No*."  (Emphasis added.)

When defendant asked Ms. Andrade whether she had ever seen any bruises on Marco's body, Ms. Correia's once marginally relevant testimony about seeing prior bruising became far more relevant.  The trial justice recounted the events as follows:

> "On cross-examination it was the defense attorney who explored [Ms. Andrade's] opportunities to observe the boy's body and elicited testimony from her that she had those opportunities and never saw any bruises.
>
> "As I understood it, there had been previous rulings or agreements that [Ms. Correia], the daughter of this woman, could not offer testimony that she observed bruises when she bathed the boy because, frankly, bruises on the boy could mean any number of things.  They're not connected necessarily to this [d]efendant.  Whether she saw bruises on the boy in January of '09 or December of '08 does not in any way lead to the reasonable inference that they were caused by [d]efendant.  Not at all.  So it wasn't coming in.
>
> "Then [defense counsel] asked [Ms. Andrade] if she observed bruises, as though that was relevant, and she said no.  Now, [the prosecutor] said, 'Ah, ha.  You opened the door.  I want to be able to call [Ms. Correia] and ask if she saw bruises.'"

Ultimately, over defendant's objection, the trial justice allowed the state to put Ms. Correia on the stand.[12]

According to Ms. Correia, sometime in late December 2008 or early January 2009, Marco visited Ms. Correia and his father, Rafael,[13] at her apartment.  During that visit, Rafael bathed Marco.  At some point during that bath, Rafael called Ms. Correia into the bathroom.

---

[12] The trial justice also decided that she would give a cautionary instruction to the jury, which she provided after Ms. Correia testified.

[13] We refer to Rafael Nieves by first name to avoid confusion.  In doing so, we intend no disrespect.

When she entered the bathroom, she noticed bruising on Marco's back. From her vantage point of only a few inches away, Ms. Correia described what she observed as a bruise that was "[t]he size of a softball." When Rafael asked Marco how he had gotten the bruise, the boy initially said that he had fallen. But, upon further prompting from his father, Marco told Rafael and Ms. Correia, "Mommy's boyfriend hit me." Ms. Correia testified that, when Marco admitted this, he appeared "upset" and "sad."[14]

## A

### Standard of Review

"We have long held that 'decisions concerning the admissibility of evidence are within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of that discretion is apparent.'" *State v. Martinez*, 59 A.3d 73, 85 (R.I. 2013) (quoting *State v. Gaspar*, 982 A.2d 140, 147 (R.I. 2009)).

## B

### Discussion

The defendant argues that Ms. Correia's testimony was inadmissible under Rule 404(b), and, alternatively, even if it were admissible under that rule, that it should have been excluded under Rule 403. In defendant's view, because Ms. Correia did not specify who Marco was referring to when he said "Mommy's boyfriend hit me[,]" the testimony was speculative and not relevant to defendant's intent in this case. The crux of defendant's argument is that, because the relevance of this speculative reference was low and the potential for undue prejudice was high, the testimony should have been excluded under Rule 403. Based on the recitation of events at trial, however, it is our opinion that the trial justice did not err when she allowed Ms. Correia to

---

[14] At this juncture, the trial justice gave a cautionary instruction; there was no objection.

testify. The defendant, by interrogating Ms. Andrade about bruising, did indeed open the door to the relevancy of Ms. Correia's testimony. Accordingly, it is our opinion that the trial justice was well within the considerable bounds of her discretion when she allowed the testimony.

Rule 404(b) provides, in pertinent part, that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith." However, such evidence "may * * * be admissible" if it is offered "for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable." R.I. R. Evid. 404(b).

We conclude that the trial justice was correct in finding that Ms. Correia's testimony was relevant to show defendant's intent and lack of mistake or accident. From the outset of the trial, defendant's intent was at issue. Indeed, defendant, who sought and received from the trial justice an instruction on involuntary manslaughter, argued to the jury that he had not intentionally killed Marco. Rather, defendant argued, the evidence supported a finding that he, at most, accidentally injured Marco while administering a form of corporal punishment to the child. However, Ms. Correia's testimony tended to show that Marco had been beaten and bruised before, squarely addressing the questions of intent and lack of mistake or accident. We perceive no error with the admission of that evidence in this case. *See State v. Brown*, 900 A.2d 1155, 1162 (R.I. 2006) (affirming the trial justice's admission of "intent-related Rule 404(b) evidence" because the "defendant opened the door by declaring to the jury in his opening statement that [the victim's] injuries resulted from an accident and that [the] defendant never intended to hurt her").

The defendant next maintains that, even if Ms. Correia's testimony were admissible under Rule 404(b), it nonetheless should have been excluded under Rule 403. Again, we

disagree.  Pursuant to Rule 403, "[a]lthough relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."  But when defendant elicited from Ms. Andrade that she had not observed bruising on Marco's body, the relevance of Ms. Correia's perhaps once marginally relevant testimony increased, and it was no longer *substantially outweighed* by the concerns delineated in Rule 403.  In other words, the balancing analysis prescribed by Rule 403 tilted in the state's favor after defendant opened the door.[15]  Moreover, despite the fact that, as defendant points out, Ms. Correia did not specifically identify defendant as "Mommy's boyfriend[,]" we agree with the trial justice that this testimony did not mislead the jury.  Accordingly, in our view, the trial justice did not err in allowing Ms. Correia's testimony once defendant opened the door to its relevancy.

## IV

## Conclusion

For the reasons set forth in this opinion, the judgment of conviction is affirmed.  The papers shall be returned to the Superior Court.

---

[15] With respect to Rule 403, "[w]e have said that '[u]nless evidence is of limited or marginal relevance and enormously prejudicial, the trial justice should not act to exclude it.'"  *State v. Graham*, 941 A.2d 848, 862 (R.I. 2008) (quoting *Wells v. Uvex Winter Optical, Inc.*, 635 A.2d 1188, 1193 (R.I. 1994)); *see also State v. Patel*, 949 A.2d 401, 412-13 (R.I. 2008) ("It is only evidence that is marginally relevant and enormously prejudicial that must be excluded.").

**SUPREME COURT – CLERK'S OFFICE**

**OPINION COVER SHEET**

| | |
|---|---|
| **Title of Case** | State v. Michael Patino. |
| **Case Number** | No. 2016-352-C.A. (P1/10-1155A) |
| **Date Opinion Filed** | June 29, 2018 |
| **Justices** | Suttell, C.J., Goldberg, Flaherty, Robinson, and Indeglia, JJ. |
| **Written By** | Associate Justice Francis X. Flaherty |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer From Lower Court** | Associate Justice Netti C. Vogel |
| **Attorney(s) on Appeal** | For State:<br><br>Virginia M. McGinn<br>Department of Attorney General<br><br>For Defendant:<br><br>George J. West, Esq. |